Filed 6/30/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S085348 |
| v. | ) | |
| | ) | |
| GABRIEL CASTANEDA, | ) | |
| | ) | San Bernardino County |
| Defendant and Appellant. | ) | Super. Ct. No. FWV-15543 |
| _____ | ) | |

A jury convicted Gabriel Castaneda of the first degree murder of Colleen Mary Kennedy (Pen. Code, §§ 187, subd. (a), 189), one count of second degree commercial burglary (Pen. Code, §§ 459, 460), one count of kidnapping (Pen. Code, § 207, subd. (a)), one count of sodomy by use of force (Pen. Code, § 286, subd. (c)(2)), and one count of second degree robbery (Pen. Code, § 211).[1] The jury found true the allegations that the murder was committed while defendant was engaged in the commission or attempted commission of the crimes of burglary, kidnapping, sodomy, and robbery. (§ 190.2, subd. (a)(17)(A), (B), (D), (G).) The jury also found true the allegations that defendant personally used a deadly and dangerous weapon in the commission of each of the five crimes (§§ 12022, subd. (b)(1)), 12022.3, subd. (a)), and intentionally confined the victim in a manner that exposed her to a substantial likelihood of death during the commission of kidnapping (§ 209, subd. (a)). Finally, the jury further found that

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

during the commission or attempted commission of sodomy, defendant kidnapped the victim (§ 667.61, subd. (e)(1)), engaged in the tying and binding of the victim (§ 667.61, subd. (e)(5)), personally inflicted great bodily injury upon the victim (§ 667.61, subd. (d)(6)), and committed the offense of burglary of a commercial establishment that was then closed to the public (former § 667.61, subd. (e)(2), Stats. 1997, ch. 817, § 6, pp. 5575-5577). The trial court found true the allegations that defendant suffered two prior convictions for serious felonies (§§ 667, subd. (a)(1), 1170.12). The court also found that defendant suffered a felony conviction in 1987, and did not remain free of prison custody and did commit additional offenses resulting in felony convictions during the five-year period subsequent to the conclusion of his prior prison term. (§ 667.5, subd. (b).)

Following the penalty phase of the trial, the jury returned a verdict of death. The trial court denied defendant's application to modify the death penalty verdict to life imprisonment without the possibility of parole (§ 190.4, subd. (e)), and sentenced defendant to death. The court also sentenced defendant to a term of life in prison without the possibility of parole and to 123 years to life in prison with respect to the other charges of which he was convicted. This appeal is automatic. (§ 1239, subd. (b).) We reverse the judgment of conviction for kidnapping, vacate the findings related to kidnapping, and otherwise affirm the judgment.

## I. FACTS

### A. Guilt phase evidence

#### 1. Prosecution case

The victim, Colleen Mary Kennedy, was employed by P. Basil Vassantachart, M.D., at his medical clinic in Montclair, San Bernardino County, where she performed clerical tasks and provided some medical services, such as taking X-rays and assisting with physical therapy. On Mondays, she worked alone

2

at the clinic from approximately 9:00 a.m. until the doctor arrived at approximately 11:00 a.m. Her routine on Mondays was to finish her clerical tasks and then to sit in her office and read a newspaper or book until patients arrived at 10:30 or 11:00 a.m. She kept the clinic door locked while she was alone, but from her office inside the clinic, she could see the front door to the clinic, and she admitted patients when they arrived.

In February 1998, following a minor automobile accident, defendant, his brother George Castaneda and George's wife Gina Ybarba received physical therapy at the clinic. Their first two appointments were on February 26 and March 5, when Dr. Vassantachart, the victim, and a second "nurse" were present at the clinic in the morning. After one of these appointments, defendant told Ybarba that when the second nurse bent over to tie her shoe, she put her "behind" in his face, and Ybarba responded that the nurse "better not do that to George." Their third appointment was on Monday, March 9, at 9:30 a.m., when the victim was alone in the office. At some point in mid- or late March, Dr. Vassantachart or the victim informed Ybarba that there was no insurance coverage for their treatment, but the clinic would continue treatment if they would be financially responsible. Ybarba conveyed this information to defendant. Thereafter, the three received no further treatment at the clinic.

On Monday, March 30, 1998, the day of the crimes, Dr. Vassantachart's office manager, Shirley Vassantachart, spoke to the victim by telephone at 9:28 a.m., and perceived nothing unusual in their interactions. She placed another telephone call to the victim between 10:15 and 10:30 a.m., but the victim did not answer. Patients began arriving at 10:30 a.m., but the victim did not open the clinic door or answer the telephone. Thereafter, Dr. Vassantachart unlocked the

3

clinic. When he entered the victim's office, he noticed an open book on the floor, which he characterized as "very unusual."[2] He proceeded 40 to 50 feet further into the clinic, and found the victim's dead body lying facedown across a "procedure table." Photographs of the crime scene, which Dr. Vassantachart confirmed were accurate, show that the victim was naked from the waist down, except where her pants caught on one of her ankles. Her hands were bound behind her back, and her legs were splayed, with one leg hanging down from each side of the table. Her body was askew, so that her head also hung over one side of the table, and her genital area was near a corner of the table. An examination of the exterior of the building after the crimes were committed revealed no evidence of a forced entry.

Dr. Frank Sheridan, the Chief Medical Examiner for the County of San Bernardino, described the victim's condition. Her hands were tied tightly behind her back with shoelaces, which left deep ligature marks on her wrists. A gag, comprised of a sock and a shoelace, was in her mouth and wrapped tightly around her neck. She had abrasions on her forehead, on either side of her chin, and on her neck, which might have resulted from a struggle against someone holding her face and attempting to put the gag on her. There were four areas of hemorrhaging inside the scalp, which were caused by blows with a blunt object.

Sheridan concluded that the cause of death was blood loss from multiple stab wounds to the victim's neck. There were 29 wounds inflicted with a Phillips screwdriver on the back and sides of her neck. The wounds at the back of the neck, over the spine, were more shallow, where the bone would have stopped the

---

[2] At trial, the victim's husband confirmed that the book on the floor of the victim's office was the book she was reading in the days before her murder.

weapon; they were deeper on the sides of the neck.  Some of the superficial wounds appeared to have been caused by "jabbing" or "prodding" of the victim, and with respect to these "scraping" or "glancing" wounds, Sheridan agreed it was possible the screwdriver was being used "as an implement to intimidate."  At least 15 of the wounds were "fairly deep," and Sheridan opined that "it would take a significant amount of pressure to enter the skin . . . with a screwdriver."  Collectively, the wounds caused much hemorrhaging into the tissues of the neck, but two wounds on the left side were the most lethal, because they opened the carotid artery and the jugular vein.  Sheridan stated it was difficult to determine how long the victim remained alive after these two vessels were severed, because blood continued to flow to and from her brain on the right side of her neck, but he stated that "it would take a matter of several minutes," and that she might have survived as long as 15 minutes.  He concluded that all of these wounds were inflicted while the victim was alive, but he could not determine the order in which they were inflicted.  The wounds' close proximity suggested they occurred within a short period of time, but they might have occurred over a period of 15 minutes, with some "inflicted at an earlier stage and the rest fairly quickly after."  The gag was in place around the victim's neck when most or all of the wounds were inflicted, as evidenced by holes in the sock.  The gag, which became soaked with blood, partially obstructed the victim's breathing, and thereby contributed to her death.

Dr. Sheridan also testified that it appeared from his external examination that there might be some bruising in the area of the vaginal entrance, but he was not able to confirm through microscopic examination of a sample of the underlying tissue that there was bruising.  He noted a small amount of dried feces around the anal area, but observed no apparent trauma to the anal region.  In addition, his internal examination of the rectum and anal area revealed nothing

5

that indicated trauma. He further explained that whether there were visible injuries from a sexual assault would depend upon how much struggling occurred and whether the injuries were inflicted when the victim was dead or near death, at which time muscles would relax and there would be little circulation to enable bruising.

No spermatozoa was found on the vaginal, rectal, and oral smears taken from the victim, but tests revealed seminal fluid on two areas of carpet and on a feces-stained sock that was found on the floor beneath the procedure table. In addition, a palm print was found on the upward-facing sheet of paper that covered the table on which the victim's body was found.[3]

In the course of their investigation, law enforcement officials obtained palm prints and DNA samples from Dr. Vassantachart's patients, including defendant. A latent print examiner identified 12 points on defendant's print and on the latent print found on the paper that matched. He testified that he was "certain" that the prints originated from the same source. A forensic scientist extracted DNA from spermatozoa found on the feces-stained sock and from defendant's saliva sample, and examined seven genetic markers using a process known as "polymerase chain

---

[3] Attached to the table on which the victim's body was found was a roll of paper from which a new piece was pulled to cover the length of the table after each patient left the room. Several patients had been seen in the room since defendant's last physical therapy session on Monday, March 9. In addition, on March 26, the Thursday before the crimes were committed, Dr. Vassantachart had performed a medical procedure on the table. A medical assistant who aided Dr. Vassantachart recalled that the procedure resulted in a loss of blood, and that she and Dr. Vassantachart cleaned up the room afterward, including changing the paper on the table. Finally, the roll had been affixed in such a way that when the paper was unrolled over the table, the side of the paper that faced the core of the roll faced upwards. Accordingly, if a person touched the roll of paper before the paper was unrolled, the print would appear on the side of the paper facing downward when the paper was unrolled.

reaction" (PCR). She determined that the seven genetic markers from the two samples matched, and that the particular DNA profile appears in one in 19 million Caucasians, one in 524 million African-Americans, and one in four million Hispanics. Another scientist analyzed five genetic markers from the DNA extracted from the sock and from defendant's DNA, using a process known as restriction fragment length polymorphism (RFLP). His analysis reflected that the genetic markers from the two DNA samples matched, and that the particular DNA profile occurs in fewer than one in six billion individuals in each of three racial categories — Caucasians, Hispanics, and African-Americans. The PCR analysis and the RFLP analysis generated different statistical frequencies because each analysis tested different genetic markers with different variability. Considering the two results together, the scientist who performed the RFLP analysis concluded that, unless the source of the DNA extracted from the sock was an identical twin or a brother of defendant, the source of the DNA was defendant.[4]

At the time of the crimes, defendant was living with his girlfriend, Virginia Castaneda, in Ontario, California.[5] On the day of the crimes, he drove Virginia's burgundy Nissan Sentra to his first day of work at a Toyo Tires distribution center. Defendant reported to work at approximately 6:00 a.m. that day, and worked until a scheduled morning break at approximately 9:00 a.m. When Robert Love, a

---

[4]    The probability that the profile generated through the RFLP testing would appear in a sibling is one in 90,000. Defendant has seven brothers, four of whom were incarcerated at the time of the crimes. PCR analysis excluded two of the brothers who were free at the time of the crimes as the source of the DNA found on the sock. There is no indication in the record that the DNA of the third brother who was free at the relevant time was analyzed. Defendant does not contend that any of his brothers was the perpetrator of the charged crimes.

[5]    At the time Virginia Castaneda was defendant's girlfriend, she was the wife of defendant's brother Juan Castaneda.

supervisor at Toyo Tires, checked after the break to ensure that everyone was working, he was informed that defendant had left at the break. According to Francisco Tello, who worked with defendant that day, at the morning break at approximately 9:00 a.m., defendant inquired where he could find something to eat, and was informed that he would have to look for food away from the work premises. Tello testified that defendant left no later than five minutes after the break started. Various law enforcement officers drove different routes between the Toyo Tires distribution center and the clinic. The longest period of time the trip required was approximately 21 minutes.

The evidence reflected that during the time period in which the crimes were committed, a vehicle similar to Virginia Castaneda's vehicle was parked at a Long John Silver's restaurant located in the same block as the clinic. Linda Salley testified that when she arrived to work at the restaurant between 9:10 and 9:15 a.m., no other vehicles were in the parking lot. Martha Carter, another employee of the restaurant, testified that when she arrived to work at 9:45 a.m., she noticed a vehicle in the parking lot, which was unusual, because the restaurant did not open until 11:00 a.m. Salley then went to the parking lot to investigate, and observed what she described as a late model burgundy-colored Japanese vehicle. The vehicle was parked on the side of the restaurant farthest from the clinic, where it could not be seen from the clinic. When Carter went to the parking lot between 10:00 and 10:15 a.m., the second vehicle was still there. Carter could not recall whether the vehicle was in the lot when she went out after 11:00 a.m., by which time police officers had arrived in the area. When shown a photograph of Virginia Castaneda's vehicle, Salley testified that the vehicle she saw in the lot was "probably" the same vehicle as in the photograph, and Carter testified that it was "similar" to Virginia Castaneda's vehicle.

George Castaneda, defendant's brother, testified that he had seen defendant use a Phillips screwdriver as a weapon. Defendant's parole officer testified that on April 20, 1998, when he searched Virginia Castaneda's vehicle, he found a Phillips screwdriver in the wheel well in the trunk, underneath a panel. The search was related to a parole violation rather than to the investigation of the charged crimes, and the parole officer did not seize the screwdriver.

On May 8, 1998, at which time defendant was in custody for a parole violation, law enforcement officers advised him of his *Miranda*[6] rights, and defendant stated he was willing to speak to the officers. He confirmed he had received treatment from the victim, and that the victim was alone in the office during one of these visits. With respect to his activities on the day of the crimes, he stated that he drove a red Nissan to Toyo Tires, arriving at approximately 6:30 a.m., he hurt his thumb unloading tires and did not want to work, so he left at the first break, at approximately 8:30 a.m.[7] He then drove to the residence of his cousin, Gloria Salazar, in El Monte, arriving at 9:00 or 10:00 a.m. He related that he awakened Salazar, went out to buy some beer and food, and then returned and talked to Salazar until he departed at approximately 3:30 p.m. to pick up Virginia Castaneda from her place of employment. When the interview resumed following a break, an officer told defendant, perhaps falsely, that Salazar said defendant did not arrive at her residence until noon on March 30. Defendant then stated that before he traveled to Salazar's residence, he saw his half brother, Louie Arroyo,

---

**6**     *Miranda v. Arizona* (1966) 384 U.S. 436.

**7**     Defendant's girlfriend, Virginia Castaneda, testified that defendant told her on Tuesday, March 31, 1998, that he had quit his job at Toyo Tires after he had an argument with somebody there. She did not recall defendant's complaining of a sore thumb.

9

standing on a street corner, in need of heroin. Defendant claimed he and Arroyo traveled somewhere to obtain heroin, and then both went to Salazar's residence.

On May 15, 1998, at defendant's request, law enforcement officers spoke with him again. At this interview, defendant stated that he left Toyo Tires at approximately 9:00 a.m., traveled to Pomona to the residence of Elizabeth Ibarra, a former girlfriend, and then traveled to Salazar's residence. Defendant stated that he did not previously mention his visit with Ibarra because he was engaged to be married to someone else. According to defendant, he arrived at Ibarra's residence at approximately 9:30 a.m., the two of them went somewhere "to meet a connection,"[8] and he remained with Ibarra until approximately 11:00 a.m., at which time he drove to Salazar's residence. Contrary to his earlier account, he stated that he did not see Louis Arroyo on March 30.

Ibarra testified that after defendant was arrested, he told her he needed her to tell the investigators he was with her at the time of the crimes. After she reconstructed her activities of March 30, she informed defendant he was not with her that day. She recalled that he insisted he was with her, and repeatedly asked her to tell the police officers that he was with her. She described him as "very upset," and she interpreted his manner as threatening. Telephone records reflected that between defendant's interview on May 8 and his interview on May 15, he placed 11 telephone calls to Ibarra.[9]

---

[8]     Defendant disclosed to the officers that he and Ibarra were "chipping." One of the officers explained at trial that "chipping" refers to the use of small quantities of heroin, "[j]ust enough to get by if you are a regular heroin user."

[9]     According to defendant's sister, Dianna Castaneda, Ibarra initially said defendant was with her on March 30, but subsequently claimed she could not tell the truth because she was being threatened by police detectives, who allegedly told her they would call her parole officer, and her children might be taken from her. Dianna Castaneda also testified that Ibarra was concerned that her husband might

*(footnote continued on next page)*

10

Ibarra also testified that defendant visited her in early March and several times in April 1998, to obtain heroin and to talk. She recalled that she purchased heroin for them when defendant visited. When asked if defendant had money, she responded, "Not very often, no." According to Ibarra, when defendant visited her, they would discuss his relationship with Virginia. In particular, he spoke "very much" about anal intercourse with Virginia — that it hurt Virginia and she complained, but he wanted to continue engaging in anal sex.[10]

The victim's husband, Steven Kennedy, testified that when his wife worked, she wore a round gold ladies' watch with a dark brown or black band, and sometimes wore a ring. After his wife's death, he was unable to find the watch or a particular gold ring with a green or red stone — he did not know which color because he is color-blind. The victim also carried to work a purse in which she kept her wallet with credit cards and cash, and a satchel containing work-related items. He searched their residence, but did not find her purse or its contents, or the satchel. He cancelled all of the missing credit cards during the first week of April. Mary Boyle, the victim's mother, also recalled that the victim always wore at least one ring. After her daughter's death, Boyle discovered that a ring she had bought for the victim, which had an emerald flanked by two diamond chips, was missing, and that one of the victim's watches was missing.

---

*(footnote continued from previous page)*

learn that defendant had been visiting her while her husband was at work. Ibarra testified that detectives threatened her based upon her parole status, telling her that if she did not tell the truth, she could go to jail, but she further testified that the detectives did not mention her children.

[10] Virginia Castaneda testified that she and defendant had never engaged in anal intercourse, defendant had never attempted to have anal intercourse with her, and defendant had never spoken about having anal intercourse.

11

According to Shirley Vassantachart, the office manager, the victim always wore one or two rings and a watch with a black leather band. She also recalled that the victim kept her purse in the office area where she read her book. She explained that the satchel to which the victim's husband referred was used by the victim to carry patient records, bills, petty cash for making change, and payments collected from patients between Dr. Vassantachart's Montclair office and his Covina office, where the victim worked on other days of the week. She testified that although the victim would have delivered the collections to the office manager the previous Friday, the victim would have had petty cash of $30 to $40 in the satchel on Monday when the crimes were committed. The investigating officers did not find the satchel, the victim's purse, or their contents at the crime scene.

In late March or early April 1998, while visiting Gloria Salazar, defendant removed a watch and a ring from his pocket, told Salazar that "this bitch got me mad," and stated that he was going to throw the items off the freeway. Salazar suggested he give the items to her, which he did. Salazar was unsure of the date, but stated that it could have been March 30. She testified that the ring was gold and had a colored stone. She could not recall the color of the stone at trial, but according to the detective who interviewed her, Salazar told him the ring had a green stone. Salazar testified that she took the ring to a pawn shop and gave the watch to a friend whom she called her "grandfather." She did not inform law enforcement officers of these facts until August 1999, by which time the ring was gone from the pawn shop; however, the grandfather still had the watch, which he gave to the police. The victim's husband testified that the watch shown to him at trial "looks like the watch she would wear, but it's kind of beat up," and he was not certain it was her watch. He stated that the finish was rubbed off, but the gold areas that remained were the same color as his wife's watch. The victim's mother, Mary Boyle, similarly testified that she did not know whether the watch shown at

12

trial was her daughter's watch, that she thought her daughter's watch was a brighter gold, and that her daughter's watch had a black leather band. Finally, Shirley Vassantachart testified that the watch at trial looked like the victim's watch, but noted that it lacked a band and that the gold around its face was faded or worn off.[11]

### 2. *Defense case*

Defendant presented evidence that he could not have been at the scene of the crimes when they occurred. First, two police officers testified that when Francisco Tello and Robert Love were interviewed in early May 1998, each said that the first work break at Toyo Tires on March 30 was at approximately 9:30 a.m., a half hour later than the time to which they testified at trial. Second, defendant's sister-in-law, Gina Ybarba, and defendant's son, Gabriel, Jr., who was 16 years of age at the time of the crimes, testified that they saw defendant at his residence mid-morning on March 30. Ybarba, who lived next door to defendant, recalled that she heard a vehicle in the driveway at 10:00 a.m. on March 30, looked out the window, and saw defendant and a dark-haired woman whom she identified as Elizabeth Ibarra. After the vehicle left, she went to the back door of defendant's apartment, and asked Gabriel, Jr., if that was his father who had driven into the driveway. He confirmed it was. Gabriel, Jr., testified that he visited defendant on weekends, and sometimes stayed until Monday or Tuesday. He recalled a Monday when Ybarba came to defendant's apartment to talk to him. On that particular Monday, defendant came into the apartment, remained for 10 to

---

[11] The watch retrieved from the grandfather had a black leather band, which was sent along with the watch to the crime lab for DNA processing. At the lab, a forensic scientist removed the band and cut it into pieces in an effort to extract DNA from it. Accordingly, the watch exhibited at trial did not have a band.

15 minutes, and then departed at 10:50 or 11:00 a.m. Gabriel, Jr., testified that he thought these events happened on a Monday, because he had returned to his mother's residence the following day at 11:00 a.m. When asked why he specifically remembered this particular visit, he testified that on that Monday, his father's girlfriend, Virginia Castaneda, had repeatedly called the apartment when defendant failed to pick her up after work, defendant had returned late that evening, and defendant and Virginia had argued.[12]

Defendant also presented evidence that law enforcement officers may have obtained from defendant's residence a sock with defendant's semen on it. Virginia Castaneda testified that defendant's parole officer and other officers came to their residence on April 20, 1998, and conducted a parole search, after defendant failed to report to his parole officer. She recalled that when the officers arrived, she and defendant were having sex, and that defendant ejaculated and wiped himself off with boxers or socks. She testified that the officers took dirty boxers, socks, and T-shirts from the bedroom. She further testified that when the residence was searched again by law enforcement officers on May 8, the officers seized almost all of the family's clothing.[13]

---

[12]    Virginia Castaneda testified during the prosecution's case that defendant picked her up from work on Monday, March 30, 1998, at 5:30 p.m., and there was nothing unusual in his behavior that day. She also testified that she thought it was the next day, Tuesday, that defendant picked her up late and they argued.

[13]    A forensic scientist testified in the prosecution's case that on April 3, 1998, she began processing the sock from the procedure room floor. She began extraction of DNA on April 6, and completed the process of typing the DNA on April 16, four days before the parole search of defendant's residence.

14

*3. Rebuttal*

Several law enforcement officers testified concerning their parole search of defendant's residence on April 20, 1998. Defendant's parole officer recalled that when he first saw Virginia Castaneda, she was in bed with an intravenous (IV) drip attached to her arm, and "[s]he looked very ill." He asked her the reason for the IV, and she said that she was having problems with her pregnancy. At the time of the search, the parole officer was unaware of the charged crimes, and he did not learn of the homicide investigation of defendant until three to four weeks after the parole search. The only clothing seized during the search was a beanie and a shirt the parole officer found hidden on top of a cabinet in the kitchen. He confirmed he found a screwdriver in the trunk of Virginia's burgundy Nissan Sentra, but he did not seize the screwdriver. A second parole officer, who was also unaware of the homicide investigation at the time of the parole search, confirmed the testimony of defendant's parole officer, except he did not recall seeing or hearing about a screwdriver. A police officer who accompanied the parole officers recalled that Virginia was attached to an IV drip, and described her as "obviously ill." A detective from the Montclair Police Department, the lead agency in the investigation of the charged crimes, testified that no one from that department was involved in the parole search of defendant on April 20, 1998. He estimated that he learned of the parole search "sometime after May 6."

Elizabeth Ibarra testified that she initially thought it was possible defendant had been with her on March 30, but changed her mind after she reviewed her telephone records and spoke to her relatives. She also testified that, unlike the dark-haired woman whom Ybarra and Gabriel, Jr., claimed to have seen with defendant on March 30, she had had blond hair for 12 years, until approximately two weeks before testifying at trial. She testified she had never been to defendant's residence in Ontario.

15

## B. Penalty phase evidence

### 1. *Defense case*

At defendant's request, the defense presented its penalty phase witnesses first. Richard Hall, Ph.D., a clinical psychologist, reviewed defendant's records from the California Department of Corrections (CDC; now the Department of Corrections and Rehabilitation), and performed psychological evaluations on defendant. According to the Wechsler Adult Intelligence Scale Revised, defendant has an IQ of 84, which is in the low average range of intellectual functioning. According to the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), defendant was depressed, and he was "a very male oriented person." Hall found no indication of any mental defect; in particular, he found no evidence of psychosis or schizophrenia. Dr. Hall characterized defendant's difficulty in adjusting to society as a personality disorder caused by his environment. According to Hall, records from the CDC reflected that during defendant's incarceration in a maximum security prison, he was found guilty of rules violations, "for either being out of bounds or fighting," and was disciplined by being isolated from the general prison population in a higher security housing unit.

Hall explained that there are four security levels in California prisons, and that levels 3 and 4 are maximum security levels, where prisoners' movements are highly regulated and controlled. He stated that a defendant sentenced to life imprisonment without the possibility of parole will never be placed outside of a maximum security setting. Television, radio, and an hour in the yard are available to a prisoner in levels 3 and 4, unless the prisoner fails to follow prison rules. Hall testified that, according to studies, prisoners confined in levels 3 and 4 tend to adopt to the rigid structure and become good workers, and may have difficulty surviving outside of a highly structured prison environment. Hall opined that defendant could function in a prison setting "without much difficulty," and

16

testified that nothing in his evaluation of defendant led him to believe that defendant could not survive in prison the rest of his life.

Frank Gawin, M.D., a psychiatrist whose specialty focused on the effects of medication and drugs on the brain, obtained information from defendant about his history of drug use. From 12 to 14 years of age, defendant abused inhalants, and at age 14, he began using marijuana and ethanol. According to Dr. Gawin, drug use at such an early age indicated that defendant was in an environment in which drugs were available and permitted. He also testified that drug use at 12 years of age limits a child's capacity for maturation, by interfering with the ability to perceive social and moral signals correctly and to remember the consequences of one's actions. Defendant's drug use was mild from age 20 to age 24, when he was working at two jobs and maintaining a relationship. Dr. Gawin characterized defendant's life from age 20 to 24 as "relatively stable," but acknowledged that during this period, defendant was sentenced to the California Youth Authority (now Division of Juvenile Justice) twice, for burglary and assault with a deadly weapon, escaped from the Youth Authority, was arrested for drugs and possession of a sawed-off rifle, and fathered children with three different women. At 24 or 25 years of age, defendant began using heroin and cocaine. His cocaine use ended at age 34, as a result of experiencing a panic attack while on the drug, but he became dependent on heroin, and used it in moderate amounts in the morning and periodically during the day, to stave off symptoms of withdrawal and his increasing depression. In sum, Dr. Gawin testified, defendant suffers from the mental illnesses of drug dependence, a major depressive disorder, and an anxiety disorder.

Armando Morales, Ph.D., a professor of psychiatry and biobehavioral sciences, who specialized in the study of Hispanic gang culture, received information about defendant's family and his prison record, and interviewed

17

defendant.  Defendant's maternal grandparents were farm workers who emigrated to the United States from Mexico in 1920.  Defendant's grandmother suffered from depression and his grandfather was a heavy drinker, but Dr. Morales was not able to establish whether the grandfather was an alcoholic.  Defendant's mother also reported that she herself was a moderate to heavy drinker from 17 to 22 years of age.  Although Dr. Morales learned there was "heavy use of alcoholic beverages" among the mother's sibling group, he could not confirm whether any of the siblings were alcoholics.

Dr. Morales testified that defendant's mother was raped when she was 12 years of age, and thereafter had three "marital relationships."  The first relationship began when she was 14 years of age and the man was 19.  She gave birth to a daughter during this relationship.  At age 16, she became involved with a boy, 15 years of age, who was a "heavy drinker."  During this second relationship which lasted from 1958 to 1966, she gave birth to five sons and a daughter, including defendant, who was born in 1960.  Each of the five boys had juvenile and adult criminal histories, were dependent on drugs, and served time in prison.  At 26 years of age, she entered a relationship with a man who had a history of drug problems and incarceration, and they had two sons, both of whom developed drug problems and served time in prison.

Dr. Morales reported that defendant's mother left defendant and his siblings with her parents during the day while she worked, but her parents had little control over the children, and defendant and some of his brothers became involved in "turf-oriented" Hispanic gangs.  Morales identified numerous factors related to gang membership, including poverty, parenting problems, family members who are in gangs, violence in the family or the neighborhood, poor education and employment history, and a person's age.  He described gangs as surrogate families for their members, and stated that defendant was initiated into a gang at 12 to 15

18

years of age. At 20 or 21 years of age, defendant married Elvira Moreno, whose parents and siblings were better educated than defendant's family. During the period defendant lived with Elvira's family, he obtained employment and dissociated himself from his peers, but eventually he was drawn back to his brothers, became involved in drugs again, and was rejected by his wife.

Dr. Morales found that defendant fit within three psychiatric diagnostic categories: substance abuse dependence, mood disorder (depression), and dependent personality. Symptoms of his depression included anger and irritability, and a lack of energy, drive, or direction when he was on his own rather than in an institution. Morales stated that depression may have biological and environmental components. With respect to defendant's dependent personality, Morales stated that after 10, 11, or 12 years of age, defendant became a follower, dependent on peers.

Various relatives and friends of defendant testified on his behalf. Lucia Gonzalez gave birth to defendant's son, Gabriel Castaneda, Jr., in December 1981, but her relationship with defendant ended soon thereafter. Their son visited defendant on three or four weekends in 1998, until defendant was arrested for a parole violation in April 1998. Approximately one week after that arrest, defendant asked their son to claim that a firearm found in defendant's residence belonged to the son. Gabriel, Jr., confirmed that defendant exerted "a little bit" of pressure on him to claim ownership of a firearm, but defendant respected his decision not to claim ownership. He asked the jury to consider a punishment other than death, because he would like to become better acquainted with defendant.

At about the time defendant's relationship with Gonzalez ended, he began a relationship with Elvira Moreno, who became pregnant. They married in 1982, and lived together with her parents for almost a year, but she ended their relationship when she found a syringe in his pocket. She testified that defendant

19

treated her with respect, but struck her once, causing bruising around her eye. Defendant was incarcerated during most of their son's childhood, but he wrote letters and drew pictures for their son, and advised him to stay in school, take care of his mother, and stay away from gangs. Defendant's father-in-law testified that defendant complied with his rules while residing in the Morenos' home in 1982, but changed and "went the other way" when he associated with his brothers and other relatives.

Henry and Louie Arroyo, the sons of defendant's mother and stepfather, testified that each of their mother's eight sons belonged to a gang, each had served time in prison, and most had used heroin. According to Henry, his father, who "practically raised" defendant, also used heroin. Both Henry and Louie testified that they never saw defendant strike a woman.

Defendant's sister, Dianna Castaneda, testified that defendant was protective towards her, and she never saw him abuse a woman. When defendant was released from prison in 1997, she took him into her residence, and he became very active in her church. After a couple of months, however, defendant stopped following rules Dianna established for living in her home and he began a relationship with Virginia Castaneda, the wife of his brother Juan. Dianna expressed disapproval, and defendant moved out of her residence and stopped attending church services. Dianna's friend Yvonne Tovar testified that she had known defendant for approximately 19 years. She described him as "nice to everyone, very cordial, very respectful," and she could not recall him ever striking a woman.

2. *Prosecution case*

George Castaneda, defendant's brother, testified that he and his brothers were "born and raised" in their neighborhood gang and had used heroin, but after

being released from prison a second time, George stayed away from his family and completed his parole without any violations. He stated that their stepfather encouraged the brothers to obtain drugs and alcohol for the stepfather, and that the brothers drank and smoked marijuana with their stepfather. George had never seen defendant strike a female.

Testimony was presented concerning an armed robbery by defendant in August 1991. Daniel Hills testified that as he was unlocking the door to his truck, an arm grabbed him around the neck and "practically picked me up off the ground." His assailant told him not to turn around or the assailant would shoot him. One or two other people searched his pockets and took all of his belongings. His assailants then threw him on the ground, tied his hands behind his back with his belt, removed his shoe and sock, shoved the sock in his mouth, kicked him in the side, and drove away in his truck. The day after the truck was stolen, California Highway Patrol officers found defendant at the scene of a collision, slumped in the passenger seat of the truck. Defendant was convicted of the offenses.

Deputy Joe Braaten of the San Bernardino County Sheriff's Department, testified that in June 1999, he received an anonymous note that an inmate named "Gato" had a syringe in a lotion bottle in his cell. He identified defendant as "Gato," and searched the cell defendant shared with another inmate. He found nothing in the lotion bottle, but he found a syringe stored inside a deodorant container labeled "Gato," a needle stored inside a soap container, a homemade handcuff key inside a baby powder jar, and a weapon manufactured from a hard plastic spoon in plain view. On cross-examination, Braaten agreed that prisoners sometimes attempt to cause trouble for other prisoners. He confirmed he found it odd that the weapon was left in plain view, and said he did not know which of the cell's occupants owned the items found in the cell. He also testified that when an

inmate is away from a cell during a recreation period, the cell door remains open for approximately five minutes, and it would be possible for another inmate to go into the cell for a brief time.

Elizabeth Ibarra testified that she met defendant when he was in jail, and they began living together when he was released. Less than six months later, they stole a stereo in order to obtain drugs, and were arrested following a high-speed chase. After they were released from prison, they lived together again. She testified that when "[defendant] uses drugs, he gets angry. . . . And when he gets mad, he hits." When she refused to have sex with him, "[h]e'd get mad and I would have to do it anyway." She stated that he would tie her to his arm to prevent her from leaving at night. She recalled an instance when defendant beat her, and defendant's sister contacted Ibarra's mother and brother to come to retrieve Ibarra. Ibarra's mother recalled seeing bruises on Ibarra's neck and wrists, and testified that Ibarra told her defendant had tried to choke her.

Psychologist Sandra Baca testified that it is common for victims of abuse to minimize or deny abuse, and to return to the abuser. She reviewed the data Dr. Hall generated in applying the MMPI-2 test to defendant, and determined that Hall had made an error in his calculations, resulting in his conclusion that defendant was depressed. She testified that, correctly calculated, the MMPI-2 results reflected that defendant "meets the criteria for an antisocial personality disorder and with some depressive features and with some alcohol and substance abuse." Dr. Baca stated that people with antisocial personality disorder do not develop feelings for other people, and they use others to further their own goals. Such individuals may be outwardly gracious, in contrast to the persona they exhibit "behind closed doors," and many are "master manipulators." Unlike depression, "personality disorders . . . are not amenable to treatment at all." According to Dr. Baca, these individuals know what they are doing, but they do

22

not think about being apprehended, and only after they are apprehended do they devise an explanation for their actions. Finally, she testified that defendant could have led his life differently, but "he has chosen to exercise the wrong choices."

## II. DISCUSSION

### A. Pretrial Issue

*Defendant's absence from two hearings*

Defendant contends his absence from two conferences violated his right to be present during the trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, article I, sections 7 and 15 of the California Constitution, and sections 977, subdivision (b), and 1043, subdivision (a).

The first conference between the court and counsel occurred during jury selection, as proceedings were about to resume, and the trial judge asked to "see counsel in the hallway for a moment." Out of the presence of defendant and the prospective jurors, the court stated that it "needed to put on the record and inform you both" that a prospective juror had told the court's jury coordinator that the prospective juror "had been informed by someone, they couldn't tell who, that they were all going to be videotaped." According to the court, the jury coordinator had "checked and found no one with a video camera outside the jury assembly room. And [the bailiff] said he didn't see anyone out in the hallway. I don't know where it came from or who it was by or if you know anything about it at all." The prosecutor and the defense counsel responded that they would object if someone brought a camera into court. The court reiterated its purpose of ensuring counsel was aware of the report, and added that the jury coordinator did not have the juror's name. "So we are in a situation where we have very little information other than that general information." Defense counsel stated, "I am just going to ignore it at this point." The prosecutor added that he would do the same. Finally,

the court stated that if it learned anything more, it would bring the information to counsel's attention.

The second conference occurred again during jury selection after defense counsel undertook to explain to prospective jurors differences between the guilt and penalty phases of trial. With respect to the penalty phase, defense counsel stated that "[y]ou can consider what type of upbringing he had. You can consider the area he lived in. You can consider his education." The prosecutor asked to approach the bench, and the court directed that counsel meet with the court in the hallway. At the conference, the prosecutor objected that defense counsel's comments were incorrect statements of the law. The court directed defense counsel not to preinstruct the prospective jurors, but the prosecutor clarified that he was not objecting to preinstruction, only to reference to "neighborhood and so forth." Defense counsel then asserted that "if I start talking about aggravating versus mitigating, [the prospective jurors] don't know what the heck I'm talking about." The court responded that it had already introduced the concepts of aggravating and mitigating circumstances to the prospective jurors, and defense counsel agreed to rephrase his comments. When voir dire resumed, defense counsel noted that the court had alluded to "the aggravating factors and the mitigating factors," and asked whether anyone on the panel "would feel that once the guilt phase is over and if you convict [defendant], that no matter what, at that point you won't listen to the mitigating factors that might be presented by me in this case?"

Although a criminal defendant generally has a right to be personally present at trial, there are various limitations upon this right. First, " '[u]nder the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." '

24

[Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1231 (*Cole*); see also *Kentucky v. Stincer* (1987) 482 U.S. 730, 739 ["the Confrontation Clause's functional purpose [is to] ensur[e] a defendant an opportunity for cross-examination"].) Defendant provides no explanation concerning how these conferences during jury voir dire proceedings had any relation to his opportunity for effective cross-examination, nor do we perceive any relation. (See *People v. Gray* (2005) 37 Cal.4th 168, 198 (*Gray*) [litigants must support each legal point with argument].)

Second, " 'under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a "stage . . . that is critical to [the] outcome" and "his presence would contribute to the fairness of the procedure." ' [Citations.]" (*Cole, supra*, 33 Cal.4th at p. 1231; see also *Kentucky v. Stincer, supra*, 482 U.S. at p. 745 [same].) Defendant contends his presence at the first conference concerning the videotaping rumor would have contributed to the fairness of the trial. He bases his contention upon a subsequent event during jury selection: later the same morning, the prospective juror who had spoken to the jury coordinator about videotaping stated, in the presence of other prospective jurors, that the courthouse allowed videotaping and that he was concerned about gang retaliation in the event the jury returned a guilty verdict. Defendant asserts that, had he been present at the conference, he would have had the opportunity to object to the decision not to pursue the matter. Then, according to defendant, the prospective juror could have been questioned outside the presence of other prospective jurors, and the jury pool would not subsequently have been exposed to comments concerning gangs. His theory is speculation, and therefore is inadequate to establish that the conference was "critical" or that his presence would have "contributed to the fairness" of the procedure. (*People v. Harris*

25

(2008) 43 Cal.4th 1269, 1307; *People v. Waidla* (2000) 22 Cal.4th 690, 742 (*Waidla*).)

With respect to the second conference, concerning the propriety of defense counsel's description of mitigating factors, defendant asserts he "could have assisted counsel by providing information about himself that could have been used to explain the concepts of aggravation and mitigation in a way that would have avoided the prosecutor's objection." Defendant's claim lacks merit. The conference concerned a legal issue — whether defense counsel was misstating the factors that may constitute mitigating circumstances. Therefore, defendant did not have a right to be present. (*People v. Perry* (2006) 38 Cal.4th 302, 312.)

For the same reasons we have rejected defendant's contentions under the Sixth and Fourteenth Amendments to the federal Constitution, we also reject his assertions of error under state law. " 'The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]' [Citation.]" (*People v. Butler* (2009) 46 Cal.4th 847, 861.) "Under article I, section 15 of the California Constitution, 'a criminal defendant does not have a right to be personally present "either in chambers or at bench discussions that occur outside of the jury's presence on questions of law or other matters as to which [his] presence does not bear a ' " 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' " ' " [Citations.]' [Citations.]" (*Cole, supra*, 33 Cal.4th at p. 1231.) Defendant provides no additional argument concerning the asserted violation of his rights under the California Constitution, and we perceive no manner in which his presence at either of the two conferences bore a reasonably substantial relationship to his opportunity to defend against the charges. For the same reason, defendant had no right under sections 977 and 1043 to be personally present at these bench discussions, nor was a written waiver required. (*Cole*, at p. 1231.)

## B. Guilt Phase Issues

### 1. *Instruction concerning asportation*

Defendant contends the trial court provided an erroneous instruction concerning the element of asportation for the offense of kidnapping, and thereby violated his rights to due process and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7 and 17 of the California Constitution.

The trial court instructed the jury, pursuant to CALJIC No. 9.50, concerning the crime of kidnapping. (§ 207, subd. (a).) The instruction observed that kidnapping requires movement of the victim "for a distance that is substantial in character." It further explained, in language taken from our opinion in *People v. Martinez* (1999) 20 Cal.4th 225, 237 (*Martinez*) that, "[i]n determining whether a distance . . . is substantial in character, you should consider *the totality of the circumstances attending the movement*, including, but not limited to, the actual distance moved or whether the movement increased the risk of harm above that which existed prior to the movement, or decreased the likelihood of detection, or increased both the danger inherent in a victim's foreseeable attempt to escape and the attacker's enhanced opportunity to commit the additional crimes." (Italics added.)

The events at issue here occurred before *Martinez, supra*, 20 Cal.4th 225, was decided, when "the asportation standard [was] exclusively dependent on the distance involved." (*Id*. at p. 233; see *People v. Caudillo* (1978) 21 Cal.3d 562, 574, overruled by *Martinez, supra*, 20 Cal.4th at p. 229.) In *Martinez*, we held that the jury should consider instead " 'the totality of the circumstances' " in deciding whether the distance a victim was moved was " 'substantial in character.' " (*Id*. at p. 237.) We further concluded that the new standard could not be applied retroactively, because it effected an unforeseeable enlargement of the

factual basis for determining what constitutes a "substantial distance" under the kidnapping statute, and the defendant did not have fair warning of the enlargement.

For the same reasons, and as the Attorney General concedes, the standards set forth in *Martinez* cannot be applied to defendant's actions. We also conclude, as the Attorney General concedes, that "it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The prosecutor presented evidence that it would be more difficult to hear noises made in the procedure room than in the victim's office, stated to the jury that the movement was "[n]ot a great distance in terms of actual feet," and urged the jury to focus upon whether the movement increased the likelihood of the attack and decreased the risk of detection. Thus, the evidence and argument focused upon the totality of the circumstances rather than the distance. Therefore, the conviction for kidnapping must be reversed and the findings based upon kidnapping must be vacated.

### 2. Instruction concerning implied malice

Defendant contends that the trial court's instruction defining "implied malice" deprived him of his rights to due process, to trial by jury, and to be free from the imposition of cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and article I, sections 7, 15, 16 and 17 of the California Constitution.

The trial court instructed the jury that "[e]very person who unlawfully kills a human being with malice aforethought or during the commission or attempted commission of burglary, kidnapping, rape, sodomy by use of force or robbery, all of which are felonies inherently dangerous to human life, is guilty of the crime of murder . . . ." (CALJIC No. 8.10.) The court further instructed that " '[m]alice'

28

may be either express or implied.  [¶]  Malice is express when there is manifested an intention unlawfully to kill a human being.  [¶]  Malice is implied when:  [¶] The killing resulted from an intentional act,  [¶]  The natural consequences of the act are dangerous to human life, and  [¶]  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. . . ." (CALJIC No. 8.11.)  Next, the court instructed the jury that "[a]ll murder which is perpetrated by any kind of willful, deliberate and premeditated killing *with express malice aforethought* is murder of the first degree," and it explained the terms "willful," "deliberate," and "premeditated."  (CALJIC No. 8.20, italics added.) The court then instructed the jury concerning first degree felony murder, explaining that a killing may be intentional, unintentional, or accidental, but it will be murder of the first degree if it is committed in the course of specified felonies. (CALJIC No. 8.21.)

Defendant asserts that the trial court's instructions erroneously authorized the jury to find him guilty of first degree murder based upon a finding of implied malice.  " 'In reviewing [a] purportedly erroneous instruction[], "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." [Citation.]  In conducting this inquiry, we are mindful that " 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " [Citations.]' [Citation.]  'Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).)  The instructions in the present case correctly, but unnecessarily, explained "implied malice."  The instructions did not, however, inform the jury that it could find first degree murder based upon implied malice.  Nor is there a reasonable likelihood that the jury would have understood the instructions to

29

authorize such a finding. The two instructions that addressed the bases of first degree murder — CALJIC Nos. 8.20 and 8.21 — correctly explained the two scenarios in which first degree murder could be found, and CALJIC No. 8.20 required express malice in the context of willful, deliberate, and premeditated murder. We reject defendant's view that the jury would have understood CALJIC No. 8.20, which referred to murder with express malice aforethought, as encompassing only a subset of intentional murders, and would have assumed that a finding of implied malice also would support a conviction of first degree murder.[14] In any event, because the jury found that the killing was committed in the course of burglary, robbery and sodomy, it necessarily found that the killing was first degree felony murder, regardless of its understanding of the malice requirement in connection with willful, deliberate, and premeditated murder. Finally, we find no merit in defendant's assertion that the jury might have "used

---

**14** Defendant notes the prosecutor's statement that defendant must have thought, "I'm obviously putting this person at great risk," and asserts the statement indicated to the jury that conduct that has a strong likelihood of resulting in death constitutes first degree murder. Defendant has taken the statement out of context. The prosecutor explained "you have to have the intent [to] kill. Malice aforethought is defined as intent to kill." In the course of arguing that the killing was intentional, willful, deliberate, and premeditated, the prosecutor reviewed various steps defendant had taken in assaulting the victim, including moving her, binding her, sexually assaulting her, and stabbing her numerous times. He stated it was obvious the acts were intentional and that defendant had much time to question whether he should continue his assault: "[S]hould I stop here? Have I gotten in over my head? Is this something I really want to do? I'm obviously hurting this person. I'm obviously putting this person at great risk. Yet the defendant went ahead . . . and killed his victim after he had done this. This is a willful, deliberate, premeditated act with an intent to kill." Thus, the prosecutor was arguing that the actions reflected an intent to kill, not merely that they were "deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (CALJIC No. 8.11.)

30

implied malice as the standard for finding the commission of a felony in connection with the murder." CALJIC No. 8.10 explained that, to find defendant guilty of murder, it must be proved "[t]he killing was done with malice aforethought *or* occurred during the commission or attempted commission of" various specified felonies. (Italics added.) CALJIC No. 8.21 explained in connection with the charge of felony murder that "[t]he specific intent to commit burglary, or kidnapping, or rape, or sodomy by use of force, or robbery . . . must be proved beyond a reasonable doubt." Thus, the jury could not logically have concluded that if defendant merely acted with conscious disregard for human life (CALJIC No. 8.11), and did not intend to commit the specified felonies, he could be found guilty of first degree felony murder.

### 3. *Sufficiency of the evidence of kidnapping, sodomy, robbery, burglary, and of an independent felonious purpose*

Defendant contends the evidence was insufficient to support convictions for kidnapping, burglary, robbery, or sodomy, or to establish an independent felonious purpose in connection with the commission of these felonies. Therefore, he asserts, the convictions for these four felonies, any conviction for felony murder premised upon these four felonies, and the special circumstance findings that the murder was committed in the course of the commission of these four felonies, violate his right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) '[T]he relevant question is whether, after

31

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; see *People v. Staten* (2000) 24 Cal.4th 434, 460 ['An identical standard applies under the California Constitution.']; *People v. Cain* (1995) 10 Cal.4th 1, 39 [the same standard applies to the sufficiency of the evidence to sustain a special circumstance finding].)" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289-1290, fn. omitted (*Lewis*).) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.)

### a. Kidnapping

As explained above in our discussion of the element of asportation, the conviction for kidnapping must be reversed, based upon error in the relevant jury instruction. Therefore, we need not address whether substantial evidence supports the conviction.

### b. Sodomy

"Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." (§ 286, subd. (a).) Defendant makes two contentions: there is no evidence of penetration, and no evidence the victim was alive when any penetration occurred. (See *People v. Farnam* (2002) 28 Cal.4th 107, 143 [the victim must be alive at the time of penetration].)

The evidence establishes that the victim was gagged, bound, naked from the waist down, and positioned in a manner that exposed her anal area, there were

dried feces around her anal area, and the sock on which defendant's seminal fluid was found was stained with feces. From these facts, a rational trier of fact could conclude that defendant's penis penetrated the victim's anus. Defendant asserts, however, that there are other rational explanations for the circumstantial evidence, such as rape or masturbation by defendant together with defecation by the victim. In support of this contention, he cites CALJIC No. 2.01, which instructed the jury that "a finding of guilt . . . may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion." The jury was instructed with CALJIC No. 2.01, and resolved the issue of penetration against defendant.

Defendant's second contention, that there is no evidence the victim was alive at the time of penetration, also fails. The evidence establishes (1) she was already gagged and bound when most or all of the wounds were inflicted, (2) she was alive when the 29 wounds to her neck were inflicted, and (3) she might have survived as long as 15 minutes after the lethal wounds to her carotid artery and jugular vein were inflicted. From these facts, a rational trier of fact could conclude that the victim was alive when defendant sodomized her. In addition, contrary to defendant's view, the timeline confirms he sodomized the victim before she died. The victim was alive and unperturbed at 9:28 a.m., and defendant left the clinic before patients began arriving at 10:30. During this period, defendant entered, overpowered, and gagged the victim, moved her 40 to 50 feet, put her on the procedure table, bound her, stripped off her socks, shoes, and other clothing, prodded and stabbed her 29 times, and also engaged in sexual activity. Defendant's contention that there is no evidence the victim was alive when penetration occurred is without merit. (*People v. Bolden* (2002) 29 Cal.4th 515, 553 (*Bolden*).)

33

*c. Robbery*

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Defendant contends there is no substantial evidence that he took any of the victim's property, or that he formed the intent to take the property prior to the victim's death or prior to her becoming unconscious.

The evidence reflects that the victim typically wore a watch and a ring at work, and that her watch and her ring were missing from her body after her death. In addition, defendant gave a watch and a ring to Gloria Salazar, stating that "this bitch got me mad." The watch defendant gave Salazar was similar to a watch the victim wore, except by the time of trial its black leather band was missing and its finish appeared worn or faded. The ring he gave Salazar was gold with a green stone, and the victim's ring was described as gold with an emerald stone. The evidence reflects that the victim kept her purse and wallet in the office area, where she apparently was confronted by defendant as she was reading a book, and that her purse and wallet were missing from the scene. Finally, a satchel the victim carried between work and home, which contained petty cash of $30 to $40, was missing. Reviewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supports the conclusion that defendant took the victim's watch, ring, purse, wallet, and satchel. (See *People v. DePriest* (2007) 42 Cal.4th 1, 47 (*DePriest*) ["Where a person is left dead or dying in 'relative proximity' to property that was taken, and such property is later found in the defendant's possession, the jury is entitled to infer that the victim was robbed and that the defendant committed the crime"]; *People v. Maury* (2003) 30 Cal.4th 342, 402 [because property that was in the possession of the victim was missing, the jury could reasonably infer that the defendant stole the property].) The

34

circumstances that no witness was certain it was the same watch, that no witness saw which ring the victim was wearing on the day of the crimes, that the ring, the purse, the wallet, and the satchel were not recovered, and that the victim's credit cards were not used, do not render this evidence insufficient.

With respect to when defendant formed the intent to take the property, the evidence reflects defendant had been employed only sporadically,[15] he was using heroin regularly, and he did not have money to pay for drugs "very often." (See *United States v. Mitchell* (9th Cir. 1999) 172 F.3d 1104, 1107-1109 ["addiction establishes a likelihood of desperate need and lack of self-control, not just financial interest in being richer"]; *United States v. Miranda* (9th Cir. 1993) 986 F.2d 1283, 1285 [evidence of the defendant's heroin habit was admissible to demonstrate a motive to commit a bank robbery]; see also *People v. Cornwell* (2005) 37 Cal.4th 50, 96 (*Cornwell*) [evidence of poverty, without more, is not admissible to prove a motive for theft or robbery].) The purse and wallet were missing from the office area where defendant would have first encountered the victim. The victim's book was on the floor, an unusual location. The watch and ring were not present when she was discovered with shoelaces tied tightly around her wrists. Because her hands were bound behind her back, her wrists and fingers would have been directly in defendant's view as he prodded her with a screwdriver and sexually assaulted her on the table. From these facts, a rational trier of fact could conclude that defendant had a motive to steal, and that he formed the intent to steal from the victim before he traveled to her office, or soon

---

[15] Virginia Castaneda testified that from late February or early March, defendant had worked for a "couple of days" each at two businesses other than Toyo Tires. The day of the crimes was defendant's first day working at Toyo Tires.

thereafter, when he confronted her in the office, bound her wrists, and sexually assaulted her. (See *DePriest, supra*, 42 Cal.4th at pp. 46-47 [court rejected defendant's complaint that prosecution did not eliminate the possibility the defendant formed the intent to steal after he used force, finding substantial evidence he intended to steal when he accosted his victim]; *People v. Yeoman* (2003) 31 Cal.4th 93, 128-129 (*Yeoman*) [intent to steal must be formed before or during the application of force]; *People v. Navarette* (2003) 30 Cal.4th 458, 499 ["one can certainly rob a living person by killing that person and then taking his or her property"].) Therefore, substantial evidence supports the robbery conviction. Again, defendant's alternative inferences do not render insufficient the substantial evidence of his commission of robbery.

### d. Burglary

Any person who enters a building or room with the intent to commit larceny or any felony is guilty of burglary. (§ 459.) Defendant contends there was no substantial evidence that, at the time he entered the clinic, he intended to commit a felony therein.

"[A] defendant's intent . . . may be inferred from all of the facts and circumstances disclosed by the evidence. [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1157 (*Carter*).) As noted above, the evidence establishes that defendant had a motive to steal. The evidence also reflects that he desired anal intercourse, but his girlfriend resisted. In addition, the record reflects that defendant knew the victim would be alone in the office when he arrived, and that he parked his vehicle where it could not be seen from inside the clinic. Finally, the evidence reflects that defendant, armed with a screwdriver, stole the victim's property, moved her to the back of the clinic, gagged her, bound her, put her on the table, removed her clothes, sodomized her and stabbed her 29 times, all in less

36

than an hour. From the swift execution of these acts, a rational trier of fact could conclude that when defendant entered the clinic, he intended to rob and sodomize the victim.

The fact that the evidence may also support other scenarios does not render insufficient the evidence supporting the verdict. (*Bolden, supra*, 29 Cal.4th at p. 553.) Defendant's suggestions that the vehicle was not the one he was driving, or that he parked at the restaurant because he planned to dine there after his visit to the clinic, or that he parked there because he missed the turn to drive to the clinic, or that the victim angered him *after* he entered the clinic, do not preclude the reasonable inference that he entered the clinic with the intent to commit a felony therein. In addition, the circumstance that the victim may have admitted him into the clinic does not negate his felonious intent. (*People v. Frye* (1998) 18 Cal.4th 894, 954 ["a person who enters for a felonious purpose may be found guilty of burglary even if he enters with the owner's or occupant's consent"].)[16]

### e. Independent felonious purpose

" '[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.' [Citations.]" (*People v. Lindberg, supra*, 45 Cal.4th at p. 27.) "[A] jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was 'primary,' but instead the

---

[16] Because we find substantial evidence that defendant entered the clinic to commit a felony, we need not address the Attorney General's alternative theory that defendant's entry into the procedure room with the intent to commit a felony also constituted burglary.

jury need only determine whether commission of the underlying felony was or was not merely incidental to the murder." (*Bolden, supra*, 29 Cal.4th at p. 558.) "[A] 'concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 511 (*Abilez*).)

Defendant contends there was no evidence of an independent felonious purpose with respect to the special circumstances based upon sodomy, robbery, and burglary.[17] As explained previously, the substantial evidence supporting defendant's convictions for sodomy, robbery and burglary also supports the conclusion that those felonies were not merely incidental to an intended murder. "This behavior was not incidental or ancillary to the murder, but amply demonstrates an independent felonious purpose in support of the . . . special circumstances." (*Abilez, supra*, 41 Cal.4th at p. 511.) Contrary to defendant's suggestion, *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), *Ring v. Arizona* (2002) 536 U.S. 584 (*Ring*), and *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), do not require that the jury expressly find each element of a special circumstance.

### 4. Absence of instructions on lesser included offenses of second degree murder, involuntary manslaughter, false imprisonment, and grand theft

Defendant contends that the absence of jury instructions concerning second degree murder, involuntary manslaughter, false imprisonment, and grand theft deprived him of his rights to due process, a fair trial, a jury determination of every

---

**17** Because the conviction for kidnapping must be reversed based upon error in the relevant jury instruction, we need not address whether substantial evidence supports the conclusion that defendant had an independent felonious purpose in connection with the kidnapping conviction.

material fact, a proper determination of death eligibility, and reliable determinations of guilt and penalty under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and article I, sections 1, 7, 15, 16 and 17 of the California Constitution.

"It is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826; see *Beck v. Alabama* (1980) 447 U.S. 625, 637.) "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction' [Citation.]" (*Cole, supra*, 33 Cal.4th at p. 1215.) Substantial evidence "is not merely '*any* evidence . . . no matter how weak' [citation], but rather ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' [] that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) " 'On appeal, we review independently the question whether the court failed to instruct on a lesser included offense.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

As explained below, we need not decide whether the evidence would have supported a charge of second degree murder, because the jury's findings establish that the jury found defendant guilty of first degree felony murder. In addition, because there was no substantial evidence to support convictions for involuntary manslaughter or grand theft, the court was not required to instruct the jury concerning these crimes. Finally, because the conviction for kidnapping must be reversed, based upon error in the relevant jury instruction, we need not decide whether the jury should have been instructed concerning false imprisonment as a lesser included offense of kidnapping.

## a. *Second degree murder*

The trial court instructed the jury concerning two theories of first degree murder: (1) willful, deliberate, and premeditated murder, and (2) killing in the commission of specified felonies. (§ 189.) The court initially indicated that it also would instruct the jury concerning the lesser included offense of second degree murder, but ultimately declined to do so, stating that, earlier, it "had not taken into consideration the nature of the gagging and the binding." The verdict did not indicate whether the conviction for first degree murder was based upon a finding that the murder was willful, deliberate, and premeditated, or that the killing occurred in the commission of specified felonies. As noted above, however, the jury found true the allegations that the murder was committed while defendant was engaged in the commission or attempted commission of the crimes of burglary, sodomy, and robbery. (§ 190.2, subd. (a)(17)(A), (D), (G).) Because "the elements of felony murder and the special circumstance[s] coincide, the true finding[s] as to the . . . special circumstance[s] establish[] here that the jury would have convicted defendant of first degree murder under a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder. [Citations.]" (*People v. Elliot* (2005) 37 Cal.4th 453, 476 (*Elliot*).) Therefore, the jury necessarily found defendant guilty of first degree felony murder, and any error in not instructing the jury concerning second degree murder was harmless beyond a reasonable doubt.

Defendant urges the court to hold that second degree murder is a lesser included offense of first degree *felony* murder. He notes that we declined in *People v. Valdez* (2004) 32 Cal.4th 73, 114, footnote 17, to address this issue. We noted, however, the Attorney General's contention that second degree murder is *not* a lesser included offense of first degree felony murder, because malice is an element of second degree murder, but is not an element of first degree felony

40

murder. We ultimately concluded in *Valdez* that the trial court did not err in failing to instruct the jury on second degree murder, because there was no substantial evidence "that the killing was other than [a] robbery murder." (*Id.* at p. 116.) Here, defendant does not address (1) how second degree murder, which requires malice, can be a lesser included offense of first degree felony murder, which does not require malice, or (2) what substantial evidence supports the conclusion that the killing was other than a burglary robbery sodomy murder.

Defendant also cites *People v. Blair* (2005) 36 Cal.4th 686, in which the defendant was charged with murder by the administration of poison. (See § 189 ["All murder . . . by means of . . . poison . . . is murder of the first degree"].) We acknowledged in *Blair* that "[i]f a jury is not satisfied that a defendant acted with either express or implied malice, it may find the defendant guilty of *second degree* murder on a felony murder theory." (*Blair*, at p. 745, italics in original.) We concluded, however, that (1) there was no substantial evidence that the defendant intended merely to injure the victim, and (2) any error in failing to instruct the jury concerning second degree felony murder was harmless, because the jury found true the special circumstance that the defendant *intentionally* killed the victim by the administration of poison. (*Id.* at pp. 746-747.) Similarly, in the present case, (1) there is no evidence that defendant intended merely to injure the victim when he bound and gagged her, inflicted 29 wounds to her neck, and left her bleeding on the procedure table, and (2) the jury's finding that the killing was committed while defendant was engaged in the commission or attempted commission of the crimes of burglary, sodomy, and robbery precluded the jury from finding that the murder was of the second degree. (See § 189 [murder committed in the perpetration or attempt to perpetrate robbery, burglary, or forcible sodomy is murder of the first degree].) Therefore, our acknowledgement in *Blair* that second degree *felony*

41

murder could be a lesser included offense of first degree murder in the circumstances of that case is of no assistance to defendant.

Finally, defendant asserts that "[s]econd degree felony murder instructions would have presented the question whether [defendant] murdered [the victim] while committing a dangerous felony other than kidnapping, burglary, sodomy, and robbery," but he does not identify what other dangerous felony he might have committed.

### b. Voluntary manslaughter

After the trial court noted that it had been provided with proposed instructions concerning attempted rape and attempted sodomy as lesser included offenses to rape and sodomy, it inquired of defense counsel, "with regard to lesser included offenses, are there any others that you are aware of?" Defense counsel responded, "No, I don't believe so." The prosecutor then stated, "just for the record, on that particular point on the lesser includeds, [defense counsel] and I have had discussions concerning this particular point in the case on several occasions. And [defense counsel] has indicated that this is a tactical thing on his part, and I will speculate as to what it is and I can understand what it may or may not be. But not to go into anything else, we have had discussions on this." The trial court responded, "All right," and then proceeded to review other jury instructions. Defense counsel did not dispute the prosecutor's statements.

Based upon this exchange, respondent contends the doctrine of invited error bars defendant from challenging the absence of an instruction concerning voluntary manslaughter. Although "the doctrine of invited error . . . applies if the court accedes to a defense attorney's tactical decision to request that lesser included offense instructions not be given" (*People v. Prince* (2007) 40 Cal.4th 1179, 1265), the record does not reflect that defense counsel made a tactical

decision with respect to an instruction concerning voluntary manslaughter. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1299 ["the record shows no tactical reason, and therefore we do not apply the invited error doctrine"]; *People v. Wilson* (2008) 43 Cal.4th 1, 16 [the defendant's agreement that the court need not instruct on specific lesser included offenses was not invited error, because defense counsel did not express a deliberate tactical purpose for agreeing]; *People v. Valdez, supra*, 32 Cal.4th at pp. 115-116 [because the record was ambiguous as to which lesser included offenses counsel had considered and rejected, the doctrine of invited error did not apply].)

Voluntary manslaughter "is the unlawful killing of a human being without malice," committed "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) As we recently reiterated, to establish the crime of voluntary manslaughter, there must be evidence that (1) the defendant killed in the heat of passion, and (2) such passion would be aroused in an ordinarily reasonable person under the circumstances. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1168-1169.) The evidence defendant cites in support of these elements is his statement to Gloria Salazar that "this bitch got me mad," his statement that he had injured his thumb working at Toyo Tires, and the presence of the victim's book on the floor of her office. From this evidence, he proposes that the jury could have inferred that he traveled to the clinic to obtain treatment for his thumb, and "[o]nce [defendant] arrived at the medical clinic, events transpired out of control because [defendant] became angry over some conduct or comment by the victim." We reject this claim. The evidence does not reflect any provocation, and the theory is mere speculation. (See *People v. Wilson* (1992) 3 Cal.4th 926, 941 ["Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense"].) Further, his theory is at odds with the evidence that he parked his

vehicle where it could not be seen from the clinic. There was no basis for a voluntary manslaughter instruction.

### c. Grand theft

As discussed above, defense counsel informed the trial court that he did not believe there were any other lesser included offenses, and the prosecutor stated that defense counsel had made a tactical decision concerning lesser included offenses. The record does not reflect, however, that defense counsel made a tactical decision not to request an instruction concerning grand theft. Therefore, the doctrine of invited error does not apply to this claim.

" 'Theft is a lesser included offense of robbery, which includes the additional element of force or fear.' [Citation.] If intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent. [Citations.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055-1056; see *Yeoman, supra*, 31 Cal.4th at pp. 128-129 [to constitute robbery, intent to steal must be formed before or during the application of force].) "Nevertheless, 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense . . . .' [Citation.]" (*DePriest, supra*, 42 Cal.4th at p. 50.) "Instructions on after-acquired intent and theft as a lesser included offense of robbery are unwarranted absent 'substantial evidence' that the defendant first formed the intent to take the victim's property after applying force. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 360.)

Defendant contends there is evidence to support the view that he took the victim's property as "an afterthought." He cites Gloria Salazar's testimony that when he gave her the ring and watch, he stated "the bitch made me mad," and said he planned to discard the items. He concludes "[i]t was unlikely that [defendant's] motive to commit the murder was to obtain the watch and ring if he was willing to

44

throw those objects away." He also notes that he did not profit from the watch and ring, and that the victim's credit cards were not accessed. Finally, he characterizes the time within which the victim became unconscious as "only a short period."

First, the fact that defendant had other motives for killing the victim does not constitute evidence that he formed the intent to steal only after he ceased applying force against her. For example, in *Gray, supra*, 37 Cal.4th 168, the 87-year-old victim was found in her trailer with her hands and feet bound and strips of towel tied around her head and mouth. Her nightgown had been pulled up and her underwear was around one leg. The presence of spermatozoa was detected in her vagina and rectum, and on her external genitalia. She had suffered blunt force trauma consistent with having been kicked, punched, or thrown. The home had been ransacked, and nickels and dimes the victim collected in jars, along with approximately $20 she kept in her purse, were missing. (*Id*. at pp. 180-181, 219.) Following his conviction for murder, rape, sodomy, and robbery, the defendant urged on appeal that the jury should have been instructed concerning theft as a lesser included offense. Notwithstanding the strong inference that the defendant's application of force against the victim related in large part to the sexual assault and killing, we concluded there was no evidence that the crime was something less than robbery. "Contrary to defendant's assertions, the evidence he committed a robbery was quite strong. Deadly force obviously was applied to the victim, easily satisfying the force or fear requirement for robbery. (§ 211.) And ample evidence showed the intruder had taken the victim's property. . . . Neither side presented any evidence casting doubt on [testimony that property was taken and the home ransacked]. Defendant, for example, presented a defense of simple denial, and neither he nor the prosecution presented evidence from which the jury could have inferred that he took the victim's property but formed his larcenous intent only after he killed her. [Citation.] . . . In other words, there was no substantial

45

evidence worthy of the jury's consideration that the crime was something less than robbery." (*Gray, supra*, at p. 219.) Similarly, the inferences in this case that defendant's attack was focused principally upon his desire to sodomize the victim, and that the killing was to avoid apprehension, do not support an inference that he formed the intent to steal only after he ceased applying force against the victim.

Second, as in *Gray, supra*, 37 Cal.4th 168, neither the prosecution nor the defense presented evidence that would support an inference defendant formed the intent to steal only after he applied force. The circumstances identified by defendant — he stated the victim made him mad and he intended to discard the watch and ring, he gave the watch and ring to his cousin, and he did not access the victim's credit cards — reflect that he ultimately decided not to keep or use these particular items (although he presumably spent the missing money), but these circumstances have no tendency to establish at what point in time he formed the intent to steal from the victim. Nor does the fact that the victim may have quickly lost consciousness establish when the defendant decided to steal. Because there is no substantial evidence that defendant formed the intent to steal only after he ceased applying force to the victim, the trial court was not required to give an instruction concerning grand theft.

### 5. *Prosecutor's comments concerning the evidence*

Defendant contends the prosecutor commented upon defendant's failure to testify at trial, and thereby violated his right to remain silent under the Fifth and Fourteenth Amendments to the United States Constitution. He also contends that his counsel's failure to object to the comment constituted ineffective assistance of counsel under the Sixth Amendment to the United States Constitution, and article I, section 15 of the California Constitution.

During the prosecutor's opening argument at the guilt phase, he reviewed the evidence against defendant and exculpatory testimony presented by the defense. With respect to the exculpatory testimony, the prosecutor concluded that "the witnesses out of a desire . . . to help their relative and friend, their uncle, their brother, their boyfriend, ex-boyfriend, to help him out in this situation, tried to remember things that simply were not true but that was based upon a factual incident." Following his review of the evidence, he stated, "That is the evidence in this case. *The evidence in this case is not contradicted by any other evidence in this case*. It is very clear. It is proof beyond a reasonable doubt that the defendant committed those crimes that he is charged with." (Italics added.) Defendant did not object to these statements.

The Fifth and Fourteenth Amendments to the United States Constitution "forbid[] either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (*Griffin v. California* (1965) 380 U.S. 609, 615, fn. omitted.) "Although a prosecutor is forbidden to comment ' "either directly or indirectly, on the defendant's failure to testify in his defense,' " the prosecutor may comment ' "on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." ' [Citation.]" (*Cornwell, supra,* 37 Cal.4th at p. 90.)

Defendant has forfeited his claim by failing to object. (*Lewis, supra*, 46 Cal.4th at p. 1303.) He urges the court to reject the rule that a failure to object forfeits a challenge to a prosecutor's comment upon a defendant's failure to testify, but he provides no persuasive reason to alter the rule, and we decline to do so. Alternatively, he asserts counsel's failure to object constituted ineffective assistance of counsel. This claim fails, however, because the prosecutor's statement that the evidence was uncontradicted simply reflected his view that the exculpatory evidence was not true; it was not a comment upon defendant's failure

47

to testify. Thus, defense counsel had no basis for objecting to the statement, and was not deficient for declining to do so. (See *Strickland v. Washington* (1984) 466 U.S. 668, 689 (*Strickland*).)

### 6. *Cumulative prejudice*

Defendant contends errors committed during the guilt phase had a cumulative prejudicial effect. We have found error in the trial court's instruction concerning the asportation element of kidnapping, and have concluded that the conviction for kidnapping must be reversed and the true findings related to the kidnapping must be vacated. We have also concluded that any error in failing to instruct the jury concerning second degree murder was harmless beyond a reasonable doubt, because the jury found that the murder was committed while defendant was engaged in the commission or attempted commission of the crimes of burglary, sodomy, and robbery, and therefore necessarily found defendant guilty of first degree felony murder. Together, the error and the presumed error had no cumulative prejudicial effect, and did not deny defendant a fair trial.

### C. Penalty Phase Issues

### 1. *Counsel's failure to object to the admission of evidence of defendant's escapes from custody*

Defendant contends that his counsel's failure to object to the admission of evidence of nonviolent escapes or attempts to escape from custody constituted a violation of his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution, and article 1, section 15, of the California Constitution.

During cross-examination of Drs. Hall and Gawin, the prosecutor reviewed defendant's criminal record, including two escapes from California Youth Authority facilities and one escape from the Los Angeles County jail. In addition, included in three packets of documents that were admitted to establish three prior

48

convictions (first degree burglary, second degree burglary, and second degree robbery) were probation officers' reports that listed defendant's criminal record, including escapes from custody. Finally, Deputy Braaten testified that he found a "homemade" handcuff key in defendant's cell at the facility in which he was incarcerated during the trial.

The evidence of defendant's *nonviolent* escapes was inadmissible as an aggravating factor under section 190.3, factor (b): "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence . . . ." Its inadmissibility as an aggravating factor, however, "did not render it inadmissible on cross-examination to rebut good character evidence offered by defendant. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 874; see also *People v. Boyd* (1985) 38 Cal.3d 762, 776.) In the present case, defendant presented evidence concerning his conduct in prison, his assertedly "stable life" during a period when he was not using heroin (a period when he escaped from a California Youth Authority facility), and his behavior when he was not associating with his brothers. Thus, an objection to the admission of evidence of defendant's escapes from custody would have lacked merit. Therefore, counsel's performance was not "outside the wide range of professionally competent assistance." (*Strickland*, *supra*, 466 U.S. at p. 690.)

Defendant complains, however, that the prosecutor mentioned his escapes in the course of cross-examining Dr. Hall concerning the factors that determine a prisoner's placement and security level, and that these references were unrelated to defendant's character. In addition, the references to his escapes in the exhibits that were admitted to establish defendant's prior convictions were not admitted to rebut evidence concerning defendant's character. The decision whether to object to the admission of evidence is "inherently tactical," and a failure to object will rarely reflect deficient performance by counsel. (*People v. Hillhouse* (2002) 27

49

Cal.4th 469, 502.) Because the evidence was admissible to rebut defendant's good character evidence, counsel reasonably may have decided to avoid drawing further attention to defendant's escapes with objections to brief references to the escapes in other contexts. Although counsel could have objected outside the presence of the jury to the references in the probation officers' reports, any oversight in failing to do so could not have affected the outcome, in light of the admissibility of the same evidence in other contexts.[18] (*Strickland, supra*, 466 U.S. at p. 694 ["The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"].)

### 2. *Defendant's right to present mitigating evidence*

Defendant contends that limitations placed by the trial court upon expert testimony provided by Dr. Armando Morales impaired defendant's right to present mitigating evidence, depriving him of his rights to due process and to be free from the imposition of cruel and unusual punishment under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7 and 17 of the California Constitution.

As discussed more fully below, the trial court ordered that Dr. Morales was not to testify concerning any *genetic* cause of defendant's problems. The court also precluded Dr. Morales's use of a chart that listed (1) the criteria under the American Psychiatric Association's Diagnostic and Statistical Manual of Mental

---

[18] There was no suggestion during the prosecutor's argument to the jury that the evidence of defendant's escapes represented aggravating evidence. On the contrary, he informed the jury that the only prior convictions that jurors could consider as aggravating evidence were two burglaries and a robbery, and he added that "you have heard a lot of other evidence of other crimes. Those are not factors. The only reason those other crimes were presented is to refute some of the evidence that was . . . brought before you in [connection with defendant's argument for mitigation under section 190.3 factor(k)]."

Disorders, 4th edition (DSM-IV), related to "major depression," and (2) Dr. Morales's corresponding criteria of "gang member depression." For the reasons set forth below, we conclude the trial court did not abuse its discretion.

Several principles guide our analysis. First, "The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. [Citations.] That discretion is necessarily broad: 'The competency of an expert "is in every case a relative one, i.e. relative to the topic about which the person is asked to make his statement." [Citation.]' [Citation.] Absent a manifest abuse, the court's determination will not be disturbed on appeal. [Citations.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.) Second, "the expert's opinion may not be based 'on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors . . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?' [Citation.]" (*Richardson, supra*, 43 Cal.4th at p. 1008.) Finally, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

As noted above, Dr. Morales was a professor of psychiatry and biobehavioral sciences, a field he described as "cover[ing] the biological, social, psychological research and issues related to human behavior." He had a bachelor's degree in sociology with a minor in criminology, a master's degree in social work, and a doctorate in clinical social work. He was not, however, educated as a physician or geneticist. Prior to becoming a professor, he worked as a "gang group worker" at a recreational agency, as a peace officer with the Los Angeles County Probation Department, and as a senior deputy probation officer

51

with that department.  In addition to his work as a professor, he was a consultant with the California Youth Authority.

In the course of his testimony, Dr. Morales described some of defendant's maternal ancestors who abused alcohol.  The prosecutor interposed a relevancy objection.  Outside of the jury's presence, Dr. Morales stated that mental health professionals examine family history, "because increasingly they are finding research information to show certain genetic connections between alcoholism and drug dependence in offspring."  On cross-examination, he conceded he had no training "specifically" in genetics, but testified that "they have [found] addiction genes in individuals," and that another doctor had "discovered specific gene connections from fathers to sons."  He also stated that he had not done any gene testing on defendant or any of defendant's relatives.  Upon inquiry by the court, Dr. Morales stated that when a mental health professional finds evidence of family alcohol problems, "it gives us more information to be able to draw a conclusion, whether or not there appears to be a linkage in a heredity-type of factor to a particular patient."  He added that "when we look at [defendant's] mother's history and all her sons, we begin to see a very strong preponderance of addiction in the family, which again makes more solid a particular point of alcoholism or drug addiction in this particular family that might have a very powerful genetic basis to it."  When pressed by the trial court to explain the basis of his conclusion that there were *genetic* reasons for the family history, Dr. Morales responded, "Mainly how we are trained to take the history.  But we are not experts in the genetic area.  I'm not an expert in genetic areas and have not had all that particular kind of training."  The court ruled that Dr. Morales could testify concerning defendant's family history, "but not with regard to any issues involving genetics."

The trial court did not abuse its discretion in concluding that Dr. Morales was not competent to testify concerning a genetic basis for defendant's drug and

alcohol problems. Dr. Morales testified that he had no training in genetics and was "not an expert in genetic areas." His testimony reflects that he was trained as a social worker to collect information concerning family substance abuse, but it does not establish that he was qualified to testify concerning the genetic basis of a family's history. (See *People v. Williams* (1992) 3 Cal.App.4th 1326, 1334 ["It is not unusual that a person may be qualified as an expert on one subject and yet be unqualified to render an opinion on matters beyond the scope of that subject"].)

Defendant attempts to cast the trial court's ruling as a violation of Evidence Code section 801, subdivision (b), which provides that an expert's opinion must be "[b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." He asserts that "Dr. Morales'[s] testimony that social scientists commonly look for genetic links between a patient and his family by examining the family background established that *genetics* was a matter reasonably relied upon by experts in Dr. Morales'[s] field." (Italics added.) Although there may exist genetic studies or information upon which a social scientist might reasonably rely in reaching conclusions concerning the causes of an individual's problems or conditions, Dr. Morales did not identify any such basis for the conclusions he sought to draw. He had not done any genetic testing on defendant or any of defendant's relatives. Dr. Morales stated that "increasingly they are finding research information to show certain genetic connections between alcoholism and drug dependence in offspring," and that "they have [found] addiction genes in individuals," but further inquiry revealed only that another doctor had "discovered specific gene connections from fathers to sons." Not only were the "gene connections" not identified or described, but the proffered testimony concerned defendant's *mother's* family. Contrary to defendant's assertion, Dr. Morales did not testify that "social scientists routinely base their opinions on the assumption

53

that there is a genetic link between the patient and his family." Even if he had so testified, the mere fact that there is a genetic link between a patient and his or her biological family does not qualify a social scientist to testify concerning a genetic cause of substance abuse. In sum, the "genetics" upon which defendant claims Dr. Morales reasonably relied was an area of expertise rather than information considered by the witness, and Dr. Morales conceded that he was not an expert in this area.

Defendant attempts to avoid these conclusions by contending that the trial court's ruling violated Evidence Code section 802, which provides that an expert witness "may state on direct examination the reasons for his opinion and the matter . . . upon which it is based." Because the trial court determined Dr. Morales was not qualified to testify concerning "genetics," and there was no other foundation for his proffered opinions on the subject of genetics, the court was not required to allow him to testify concerning his reasons for his opinions on genetics. Finally, defendant's assertion that "[t]he trial court . . . lacked any factual foundation for concluding that social workers could not rely on genetics in forming their assessments of individuals" ignores the burden of the profferer of expert testimony. The profferer must establish that the witness is an expert in the area upon which expert testimony will be given, and that the witness's opinion is based on matters of a type upon which such experts reasonably rely. (Evid. Code, § 801.)[19]

---

[19]    Defendant notes that the trial court also ruled that Dr. Morales could not testify that defendants' relatives were "alcoholics," but he provides no legal analysis concerning the propriety of this ruling. Therefore, we need not address the ruling. (See *People v. Catlin* (2001) 26 Cal.4th 81, 133 [because defendant "fails to offer any authority or argument in support of this claim, . . . it is not considered here"]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182 [because defendant "fails . . . to support that claim with adequate argument[, w]e . . . reject

*(footnote continued on next page)*

Next, defendant challenges the evidentiary ruling precluding Dr. Morales's use of an exhibit regarding "gang member depression." In the course of testifying about defendant's psychological disorders, Dr. Morales proposed to use a chart entitled "DSM-IV Criteria for Depression Versus Gang Member Depression," which contrasted established diagnostic criteria for depression with what he referred to as the "cultural expression" of depression in gang members. The left column of the chart listed the DSM-IV's nine symptoms of "major depression," and the right column listed nine corresponding criteria of "gang member depression."

The prosecutor objected that there was no foundation "as to the source of this material." Dr. Morales stated that he had gathered the information over more than 40 years, "based upon my clinical experience in working with gang members who had been suffering various kinds of depressions but which had been undetected by various mental health professionals because they were relying solely on DSM-IV criteria." During voir dire by the prosecutor, Dr. Morales confirmed that he had developed a new set of criteria related to depression, and he stated that he had published an article and given presentations to psychiatric peers

---

*(footnote continued from previous page)*

it as not properly raised"].) In any event, the record supports the trial court's ruling. The only basis for Dr. Morales's characterization of defendant's relatives as alcoholics was "this history that is being reported [by family members] of a drinking problem or alcoholism and so forth." The court reasonably concluded that family perceptions of alcohol abuse were relevant, but were not an adequate foundation to support a conclusion that the relatives were alcoholics. Defense counsel responded, "That is no problem. As long as he is allowed to testify about substance abuse." The trial court did not prohibit testimony concerning substance abuse.

concerning the differences in the criteria for gang member depression versus non-gang member depression.

After excusing the jury, the court commented that the prosecutor "appear[ed] to be going towards a *Kelly*/*Frye* interrogation"[20] of the witness. The prosecutor stated that he did not believe a *Kelly*/*Frye* hearing was required, because no foundation had been laid to establish that Dr. Morales's theory satisfied the criteria of a "scientific" study. The court expressed the view that the exhibit was not "suggesting a new theory of depression," and Dr. Morales confirmed that his chart did not reflect a new scientific theory.[21] The court then asked the expert witness whether "this is a step towards adding some type of specific category down the road somewhere after investigation into your observations occur[s] to the DSM-IV. He responded, "No. The DSM-IV is something totally independent." He reiterated that he was trying to report his observations, and that scientific inquiry by others might "confirm or totally

---

[20]   *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

[21]   Dr. Morales explained that his data concerning gang depression was the first step in scientific research. "Once this is published in professional journals and so forth, then the field begins to react, the field then will take some of these things and conduct in depth kinds of studies based upon the criteria you were just mentioning." The prosecutor responded that the witness was "attempting to add another category to the DSM-IV, gang member depression, and it's based upon the doctor's initial field research, and as a result, we feel there isn't foundation for the introduction at this point." The witness disputed the assertion that he was attempting to add a category to DSM-IV, and stated that he was attempting "to get the information in the field to those that work with gang members. At that point I get some feedback or people might initiate scientific studies . . . . This is the first stage. We have to begin seeing data patterns which I have done. They might say, we have tried the research and it doesn't work, or they might say, we are confirming what your initial impressions were with the particular group."

disapprove these particular behaviors in trying to arrive at some diagnostic conclusion of depression."

The court sustained the objection "with regard to the chart itself. I will allow you to make inquiry of the doctor as to his evaluation, his observations, as to his expertise and experience and what he's observed about gang members that he's studied and depression and relate that to your client, which I expect is the next step that you are going to take." The prosecutor objected that "there has been no relation" of the proffered testimony to defendant, and the court further addressed the basis and limits of its ruling. It stated it would not allow the witness to use the chart, because the chart suggested that scientific studies had been performed or would be performed concerning the witness's theory. It then explained, "I will allow you to ask him about his observations of depression in gang members. I will allow you to offer . . . that he agrees with the analysis of specifically depression. He's indicated he has relied on and reviewed the documentations from Dr. Hall and Dr. Gawin. And so I will allow you to make those connections to [defendant]. But I am going to keep [the chart] out." Defense counsel responded, "No problem."

Defendant now contends that the information set forth in the chart was admissible because (1) it was rationally based upon Dr. Morales's perceptions, (2) those perceptions were matters upon which an expert may rely, and (3) an expert may testify concerning the bases of his or her opinions. (Evid. Code, §§ 800, subd. (a), 801, subd. (b), 802.) As our summary of the record reflects, Dr. Morales was not precluded from testifying concerning *the information* set forth in his chart.

Defendant also contends that Dr. Morales's observations did not require scientific validation. Although the prosecutor's objections focused upon his expectation that Dr. Morales would testify concerning a new "scientific" study, the

57

trial court's concern was that the chart misleadingly suggested some scientific basis to Morales's criteria of gang depression.  Thus, the court did not require scientific validation of Morales's observations; rather, the court excluded evidence that suggested there was scientific validation of the observations.[22]

Finally, defendant presents no legal authority for the proposition that the exclusion of testimony based upon the incompetence of the witness or the absence of a foundation for the testimony, or the exclusion of a misleading exhibit, violates a defendant's right to present mitigating evidence.  As we have observed, "[t]he 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'  [Citation.]"  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.)

> ### 3.  *Defendant's absence from a hearing concerning penalty phase jury instructions*

Defendant contends his absence from a hearing at which the penalty phase jury instructions were discussed deprived him of his right to be present at critical stages of the trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, article I, sections 7 and 15 of the California Constitution, and sections 977, subdivision (b), and 1043, subdivision (a).

---

[22]    Presumably because defendant believes the trial court excluded the exhibit on the ground that Dr. Morales's theory required scientific validation, he does not address the propriety of the trial court's decision to exclude the chart on the ground that it was misleading.  We note, however, that in light of the trial court's ruling that Dr. Morales would be allowed to testify "about his observations of depression in gang members . . . [and] to make those connections to [defendant]," it is clear that the trial court did not abuse its discretion in concluding that the probative value of the chart was substantially outweighed by the probability that its admission would mislead the jury.  (See Evid. Code, § 352.)

Defense counsel reported to the court that defendant wished to be excused from a hearing concerning the jury instructions at the penalty phase. The trial court reviewed sections 977 and 1043 concerning the absence of a defendant at the defendant's request, and solicited the views of counsel as to whether defendant was required to be present at the discussion of jury instructions. Both the prosecution and the defense expressed the view that a court may allow a defendant to be absent upon his or her request. The court then addressed defendant: "[Y]our attorney has indicated that you are requesting to be excused while we go over jury instructions. Is that your request, sir?" Defendant responded, "That's correct, your honor." The court asked, "Do you understand we are going to finalize the jury instructions that will be given tomorrow to the jury with regard to this phase?" Defendant responded, "Yes, I understand that." The court asked, "And you still wish not to be present?" Defendant confirmed, "That's correct." The trial court allowed defendant to be excused.

Defendant acknowledges that, " 'as a matter of both federal and state constitutional law, . . . a capital defendant may validly waive presence at critical stages of the trial.' [Citation.]" (*People v. Jackson* (1996) 13 Cal.4th 1164, 1210.) He contends, however, that (1) his waiver failed to meet the standards associated with waiver of a constitutional right, (2) the trial court erred in failing to obtain a written waiver of his statutory right to be present (§§ 977, 1043),[23] (3) the trial

---

[23] Section 977 requires any defendant charged with a felony to "be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present, as provided by paragraph (2)." (§ 977, subd. (b)(1).) Section 1043 requires a defendant charged with a felony to be present at trial, except in any case in which (1) his or her

*(footnote continued on next page)*

court's failure to comply with this statutory requirement constitutes a violation of the federal constitutional right to due process of law (see *Hicks v. Oklahoma* (1980) 447 U.S. 343), and (4) the asserted errors were prejudicial. Defendant's arguments fail because he had neither a constitutional nor a statutory right to be present at the discussion of the penalty phase jury instructions.

As discussed above, in part II.A.1., there are various limitations upon a defendant's right to be present at trial. First, " '[u]nder the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." ' [Citation.]" (*Cole, supra*, 33 Cal.4th at p. 1231.) Defendant provides no explanation concerning how the discussion of penalty phase jury instructions had any relation to his opportunity for effective cross-examination, nor do we perceive any relation. (See *Gray, supra*, 37 Cal.4th at p. 198 [litigants must support each legal point with argument].)

Second, " 'under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a "stage . . . that is critical to [the] outcome" and "his presence would contribute to the fairness of the procedure." ' [Citations.]" (*Cole, supra*, 33 Cal.4th at p. 1231.) Defendant contends that during discussion of whether his escapes from custody involved the use or attempted use

*(footnote continued from previous page)*

conduct is so disorderly that trial cannot be carried on in his presence, or (2) no charged offense is punishable by death and the defendant is absent voluntarily. (§ 1043, subd. (b)(1), (2).) Section 1043 further provides, however, that its provisions "shall not limit the right of a defendant to waive his right to be present in accordance with section 977." (§ 1043, subd. (d).)

of force or violence within the meaning of section 190.3, factor (b), he could have provided counsel "useful facts about the escapes," but he does not identify any such facts. He also contends that when the prosecutor argued that defendant's escapes were admissible as aggravating evidence because "any escape has the potential for violence," defendant "could have assisted his counsel by pointing out to him that his escapes did not involve violence." According to defendant, "defense counsel may then have realized that evidence of [defendant's] escapes . . . was not proper aggravation and should have been the subject of a motion to strike." Not only is this theory speculation, but the premise of the discussion was that the escapes did *not* involve violence, only the potential for violence. Therefore, it would have made no difference if defendant had been present and reiterated that his escapes did not involve violence. Defendant has failed to establish his presence would have contributed to the fairness of the proceedings.

Third, "[u]nder article I, section 15 of the California Constitution, 'a criminal defendant does not have a right to be personally present "either in chambers or at bench discussions that occur outside of the jury's presence on questions of law or other matters as to which [his] presence does not bear a ' " 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' " ' " [Citations.]' [Citations.]" (*Cole, supra*, 33 Cal.4th at p. 1231.) For the same reasons that his presence would not have contributed to the fairness of the proceedings under the Fourteenth Amendment, his presence did not bear a reasonably substantial relation to the fullness of his opportunity to defend.

Finally, "under sections 977 and 1043, a criminal defendant does not have a right to be personally present, even in the absence of a written waiver, where he does not have such a right under article I, section 15 of the California Constitution. [Citations.]" (*Cole, supra*, 33 Cal.4th at p. 1231 [defendant's absence from in-court conferences related to guilt and penalty phase jury instructions did not bear a

reasonably substantial relationship to his opportunity to defend against the charge]; *People v. Riel* (2000) 22 Cal.4th 1153, 1195-1196 [the defendant's presence at discussions of jury instructions would not "have affected the fullness of his opportunity to defend against the charges"]; *Waidla*, *supra*, 22 Cal.4th at pp. 741-742 [conference in chambers related to instructions did not bear a reasonably substantial relation to the fullness of the defendant's opportunity to defend]; *People v. Dennis* (1998) 17 Cal.4th 468, 538 ["We find it unlikely that defendant, a layperson, would have contributed in any way to the discussions regarding appropriate instructions on issues of law"].)  For the same reason defendant had no right under the California Constitution to be personally present at these discussions, he had no right under sections 977 and 1043 to be personally present, nor was a written waiver required.  (*Cole, supra*, at p. 1231.)

### 4. *Imposition of the death penalty upon individuals with defendant's mental and emotional deficits*

Defendant contends that imposition of the death penalty upon a person with the mental and emotional deficits from which he suffers constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution, and article I, section 17 of the California Constitution.

Based principally upon the testimony of prosecution expert Dr. Baca, defendant asserts that he suffers from mental and emotional deficits that developed during his childhood, and that these deficits "impaired his ability to perceive right from wrong, contributed to impulsive behavior, and substantially diminished his culpability for the crime."  He contends that under the reasoning of *Atkins v. Virginia* (2002) 536 U.S. 304 (8th Amend. prohibits the execution of mentally retarded criminals) and *Roper v. Simmons* (2005) 543 U.S. 551 (8th Amend. prohibits the execution of minors), the execution of an individual with such

62

deficits violates prohibitions upon cruel and unusual punishment. As explained below, *Atkins* and *Roper* do not support defendant's contention.

To decide whether evolving standards of decency dictate that death is an excessive punishment, the high court looks first to objective evidence. (*Atkins v. Virginia, supra*, 536 U.S. at p. 313.) In *Atkins*, the court noted that, following the execution of a mentally retarded murderer in 1986, numerous states had acted to prohibit the execution of mentally retarded criminals. During the same period, no states had acted to reinstate the execution of such individuals. The court concluded that "it is fair to say that a national consensus has developed against it." (*Id*. at pp. 313-316, fn. omitted.) Similarly, in *Roper v. Simmons, supra*, 543 U.S. 551, the court observed that the majority of states had rejected the propriety of executing individuals who were under 18 years of age at the time they committed their criminal acts. (*Id*. at p. 568.)

In addition to considering objective evidence, the high court applies its own judgment, "by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators." (*Atkins v. Virginia, supra,* 536 U.S. at p. 313.) The *Atkins* court noted that mentally retarded individuals have diminished capacities to process information, to communicate, to learn from experience, to reason, to control impulses, and to understand the reactions of others. (*Id*. at p. 318, fn. omitted.) It also acknowledged evidence that "they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers." (*Ibid*., fn. omitted.) The court in *Atkins* concluded that these deficiencies "diminish [the] personal culpability" of such defendants. (*Ibid*.) In light of these deficiencies, the court identified two reasons for excluding mentally retarded individuals from imposition of the death penalty: (1) the justifications for the death penalty — retribution and deterrence — are not served by executing the mentally retarded, and (2) the risk of wrongful execution is enhanced by various

63

factors, including the possibility of false confessions and their lesser ability to present evidence in mitigation and to assist counsel. (*Id*. at pp. 318-321.)

Similarly, in *Roper v. Simmons, supra*, 543 U.S. 551, the court identified differences between juveniles and adults that "demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." (*Id*. at p. 569.) First, their lack of maturity and their underdeveloped sense of responsibility lead to reckless behavior, and this susceptibility to irresponsible behavior renders their conduct less morally reprehensible. Second, they are more susceptible to negative influences and pressures, and have less control over their environment. Therefore, they have a greater claim to forgiveness. Third, their personality traits are more transitory, which "means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." (*Id*. at pp. 569-570.) Due to juveniles' diminished culpability, the case for retribution is weaker than for adult murderers. In addition, it is not clear whether the death penalty has a significant deterrent effect upon juveniles. Finally, the court rejected the view that these circumstances should be considered by the jury as mitigating factors rather than as a reason for the law to preclude imposition of the death penalty upon juveniles, concluding that "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." (*Id*. at pp. 572-573.)

Defendant fails to establish that his condition — an antisocial personality disorder — is analogous to mental retardation or juvenile status for purposes of imposition of the death penalty. First, there is no objective evidence that society views as inappropriate the execution of death-eligible individuals who have an antisocial personality disorder. Second, although the expert testimony reflected that individuals with an antisocial personality disorder are not amenable to

64

treatment, the evidence also reflected that such individuals are aware of what they are doing, and that they have the ability to choose not to commit crimes. Accordingly, their disorder does not diminish their personal culpability. In addition, the justifications for the death penalty — retribution and deterrence — may be served by application of the law to such individuals. Moreover, their ability to charm and manipulate others, to deny responsibility, and to provide excuses for their conduct, enhances rather than diminishes their capacity to avoid wrongful conviction and execution. For these reasons, we believe the high court would agree with the implied legislative decision not to exclude individuals with an antisocial personality disorder from eligibility for the death penalty.

### 5. *Prosecutor's comments concerning defendant's lack of remorse*

Defendant contends the prosecutor commented upon defendant's failure to testify at the penalty phase, and thereby violated his right to remain silent guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution. He also contends that his counsel's failure to object to the comments constituted ineffective assistance of counsel under the Sixth Amendment to the United States Constitution, and article I, section 15 of the California Constitution.

During the prosecutor's argument at the penalty phase, he stated that defendant "*showed no sympathy, no empathy for her whatsoever*. We can only imagine what she was doing during this attack, and in spite of that input that she was giving, the cries, the sounds, he continued his attack upon her. It was unprovoked. There was nothing she could have done to have prevented this crime happening to her. There are murder situations in which the victim does things, goes into areas, antagonizes a dangerous person, and as a result, things happen to that person. That didn't happen here. That didn't happen here. She was a completely innocent person in this particular case. And finally, this particular

65

crime, so casual, in that the defendant, it appears, simply went to that place on a fantasy that he had, a thought that he had, knocked on the door, went in, did this all in a short period of time and then casually leaves the scene. Casually leaves the scene. That's one of the horrors in this case. The two people, three people inside that restaurant where he parked the car didn't hear any squealing of tires as he left. He casually left the scene here. *We didn't hear any evidence of, you know, being struck by the horror of the crime that he had committed here, as so often you do see in other types of murder cases. In fact, this is a rather unique case in that the defendant, the crime in this particular case, has no remorse attached to it whatsoever.*" (Italics added.) Defendant did not object to these statements.

Defendant contends that the italicized statements referred to evidence concerning his state of mind, which, he asserts, could be provided only by defendant. (See *Carter, supra*, 36 Cal.4th at p. 1266 [the prosecution may not refer to the absence of evidence that only the defendant's testimony could provide].) Defendant has forfeited his claim by failing to object. (*Lewis, supra*, 46 Cal.4th at p. 1303.) As noted above, defendant urges the court to reject the rule that a failure to object forfeits a challenge to a prosecutor's comment upon a defendant's failure to testify, but he provides no persuasive reason to alter the rule, and we decline to do so. Alternatively, he asserts counsel's failure to object constituted deficient performance by counsel. This claim fails, however, because the prosecutor's statements were not improper. Although the prosecution may not refer to the defendant's failure to testify, it may comment upon the defendant's lack of remorse. (*People v. Boyette* (2002) 29 Cal.4th 381, 453-454.) The prosecutor's comments referred to the evidence of defendant's conduct in connection with his commission of the crime, and to the absence of evidence of remorse, which might have been presented by friends or relatives who believed he

was remorseful; the prosecutor's comments did not directly or indirectly refer to defendant's failure to testify. Thus, defense counsel had no basis for objecting to the comments, and did not perform deficiently in declining to do so. (See *Strickland, supra*, 466 U.S. at p. 687.)

### 6. Instruction and argument regarding mitigating factors

Defendant contends (1) the trial court's failure to modify CALJIC No. 8.85 to delete descriptions of inapplicable mitigating factors, (2) the prosecutor's comments concerning certain mitigating factors, and (3) defense counsel's failure to object to the jury instruction and the prosecutor's comments, deprived him of his rights to due process, to a reliable determination of penalty, to be free from the imposition of cruel and unusual punishment, and to effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7, 15, and 17 of the California Constitution.

We begin with the contention that the trial court should have modified the standard jury instruction. Before evidence was presented at the penalty phase, and again following the presentation of evidence and argument, the trial court instructed the jury, pursuant to CALJIC No. 8.85, concerning the factors it should consider, "if applicable."[24] Defendant did not request any clarifying change to the

---

[24] The jury was instructed:

"In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crimes of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

"(b) The presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings,

*(footnote continued on next page)*

pattern instruction.  " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) CALJIC No. 8.85 simply quotes the factors set forth in section 190.3, and "we repeatedly have held that instructions in the language of CALJIC No. 8.85 do not violate the Eighth and Fourteenth Amendments by failing to delete inapplicable sentencing factors . . . . [Citations.]" (*People v. Ramirez* (2006) 39 Cal.4th 398, 469; see also *People v. Hartsch* (2010) 49 Cal.4th 472, 516 [the court is not

---

*(footnote continued from previous page)*

which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offenses the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (CALJIC No. 8.85.)

required to delete inapplicable statutory factors]; *People v. Taylor* (2009) 47 Cal.4th 850, 899 [same].)  Because the instruction is a correct statement of the law and defendant did not request different language, he has forfeited his claim that the instruction should have been modified.  And because the instruction does not otherwise violate his constitutional rights, his claim also fails on the merits.

Next, defendant challenges the prosecutor's remarks.  In his argument at the penalty phase, the prosecutor stated that section 190.3, factors (e) through (j) did not apply to this case.  Defendant asserts, however, that various statements by the prosecutor indicated that the absence of evidence of a mitigating factor could be considered an aggravating circumstance.  (See *People v. Davenport* (1985) 41 Cal.3d 247, 288-290 [it is improper for a prosecutor to argue that the absence of certain mitigating factors rendered them aggravating factors].)  Defendant did not object to any of the prosecutor's statements concerning the mitigating factors.  Accordingly, he has forfeited his claim.  (*People v. Redd* (2010) 48 Cal.4th 691, 749; *People v. Clark* (1993) 5 Cal.4th 950, 1030 (*Clark*).)

The claim also fails on the merits.  It is permissible for a prosecutor to observe that there is no evidence of a mitigating factor.  (*People v. Gurule* (2002) 28 Cal.4th 557, 658.)  As explained below, "[a]lthough the prosecutor noted the absence of certain mitigating factors, he did not expressly or implicitly argue that the absence of these factors could be considered in aggravation.  These statements were well within the range of proper prosecutorial argument.  [Citations.]"  (*Clark, supra*, 5 Cal.4th at p. 1030.)

With respect to section 190.3, factor (h), which addresses the effect of mental defects and intoxication, the prosecutor stated the factor "does not apply in this particular case. . . .  [¶]  We have no evidence in this case.  As a matter of fact, we have contrary evidence in this case.  The doctors testified that he may, in fact, be an addict, however, it played no part in this particular group of cases.  And, in

69

terms of mental disease, mental defect, mental illness, of any nature, the defendant simply does not have that. As a matter of fact, as Dr. Hall said, the defendant is, frighteningly enough, a perfectly normal person." The prosecutor's statement that "defendant is, frighteningly enough, a perfectly normal person," did not indicate that the absence of a mental defect or intoxication could be considered an aggravating circumstance, particularly in light of the prosecutor's repeated statements that factor (h) was not applicable to the case. Rather, the statement indicated that "defendant was less deserving of leniency, rather than more deserving of death. Argument of this type does not contravene the rule set forth in *Davenport*." (*Clark, supra*, 5 Cal.4th at p. 1031.) We decline defendant's invitation to overrule *Clark*'s distinction between statements that focus upon the absence of mitigating evidence and statements urging that the absence of mitigating evidence constitutes an aggravating circumstance. Contrary to defendant, we perceive a difference between an argument that a defendant is less deserving of leniency and an argument that a defendant is more deserving of death.

With respect to section 190.3, factor (i), which addresses a defendant's age, the prosecutor stated that it was "a factor in mitigation. It can't be reversed around and said to be a factor in aggravation." He stated that factor (i) applied when a defendant committed the crime at a young age, before he or she was socialized or understood the consequences of his or her actions. He added, "Obviously age is not a factor here in that we have a person who is just the opposite. A person who is older, a person who's had the opportunity to see the impact of many, many crimes, to see the impact upon himself, to see the impact upon his victims, and to see the impact upon his extended family. Yet, despite all of that, the defendant chose, chose — as Dr. Baca said, this man really chooses to take the very easy way through life. The very fun way, to use an odd word when we are discussing

70

this type of crime, through life.  But despite that, it's not a factor in aggravation.  You can't twist it around . . . and use it against him."  The prosecutor's comments explained why defendant's age was not a mitigating factor; contrary to defendant's contention, the comments did not urge that the absence of evidence that defendant's age was a mitigating factor rendered factor (i) an aggravating factor.[25]

Finally, defense counsel's failure to object to CALJIC No. 8.85 or to the prosecutor's statements did not constitute deficient performance by counsel.  As we have explained, the instruction was an accurate statement of the law, and the prosecutor's comments were permissible.  Therefore, counsel was not deficient for failing to object, and there is no reasonable probability that an objection would have altered the outcome.  (See *Strickland, supra,* 466 U.S. 668, 689, 694.)

### 7.  *Instruction concerning the consideration of aggravating and mitigating factors*

Defendant contends that the jury instructions failed to convey that (1) a single mitigating factor is a sufficient basis for the jury to conclude that a defendant should not be sentenced to death, and (2) a sentence of death is not required despite the absence of any mitigating factors.  He asserts the instructions thereby deprived him of his rights to due process and to be free from the imposition of cruel and unusual punishment under the Fifth, Eighth, and

---

[25]    It is not improper for a prosecutor to urge that a defendant's age is an aggravating factor.  "[W]e have observed that chronological age itself is neither aggravating nor mitigating, but the word 'age' as used in factor (i) is 'a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 201-202.)  For example, in *Carrington*, the defendant's age of 30 years was properly viewed as an aggravating factor, because her "age rendered her capable of appreciating the wrongfulness of her conduct." (*Ibid.*)

Fourteenth Amendments to the United States Constitution, and article I, sections 7 and 17 of the California Constitution.

The trial court instructed the jury, pursuant to CALJIC No. 8.88, regarding the weighing of aggravating and mitigating circumstances. We repeatedly have rejected the contention that CALJIC No. 8.88 is "unconstitutional because it fails to instruct the jury that a single mitigating factor could outweigh multiple aggravating factors and by itself could justify a verdict of life imprisonment without the possibility of parole [citation] . . . ." (*People v. D'Arcy* (2010) 48 Cal.4th 257, 304 (*D'Arcy*).) We also have rejected the contention that the instruction fails to convey that the jury "may return a sentence of life imprisonment without the possibility of parole even in the complete absence of any mitigating evidence. [Citations.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 410; see *People v. Moon* (2005) 37 Cal.4th 1, 43.) CALJIC No. 8.88 "accurately describes how jurors are to weigh the aggravating and mitigating factors. [Citation.]" (*Elliot, supra,* 37 Cal.4th at p. 488; see *People v. Carter* (2003) 30 Cal.4th 1166, 1226.) Defendant identifies no persuasive reason to alter these established principles.

### 8. *Instruction on the meaning of life without the possibility of parole*

Defendant contends the absence of a jury instruction concerning the meaning of life without the possibility of parole deprived him of his rights to due process and to be free from the imposition of cruel and unusual punishment under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and article I, sections 7 and 17 of the California Constitution.

Defendant acknowledges that we have rejected the argument that "life in prison without the possibility of parole" must be defined for the jury, but asserts that we should reconsider our conclusion in light of *Simmons v. South Carolina*

72

(1994) 512 U.S. 154 (a capital defendant was entitled to inform the sentencing jury that the alternative of life in prison would be without the possibility of parole) and *Shafer v. South Carolina* (2001) 532 U.S 36 (the rule in *Simmons* applied when neither the instruction or the argument sufficiently informed jurors that the capital defendant would not be eligible for parole). "[W]e have consistently held that the phrase 'life without possibility of parole' as it appears in CALJIC No. 8.84 adequately informs the jury that a defendant sentenced to life imprisonment without possibility of parole is ineligible for parole. [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1091. "Nothing in *Simmons*[, *supra*,] 512 U.S. 154 causes us to reconsider that conclusion." (*People v. Verdugo* (2010) 50 Cal.4th 263, 303.) In addition, "[d]efendant's reliance upon *Shafer*[, *supra*,] 532 U.S. 36, is unavailing. (*People v. Harris* [(2008)] 43 Cal.4th [1269,] 1317 [In *Shafer*, the court explained that 'the South Carolina instructions were defective because they failed to inform the jury of the defendant's parole eligibility status,' whereas the California instructions 'explicitly informed the jury that there would be no possibility of parole'].)" (*People v. Dykes* (2009) 46 Cal.4th 731, 817, fn. omitted (*Dykes*).) "[T]he concept of life in prison with no possibility of parole is clear. [Citation.] We are not persuaded by empirical claims made outside the appellate record and untested at trial suggesting the contrary is true." (*DePriest, supra*, 42 Cal.4th at p. 58.)

### 9. *The trial court's decision not to answer the jury's question concerning the consequences of a deadlock*

Defendant contends that the trial court's failure to answer the jury's question concerning what would occur if the jury could not reach a unanimous verdict at the penalty phase deprived him of his rights to due process and to be free from the imposition of cruel and unusual punishment under the Fifth, Eighth, and

73

Fourteenth Amendments to the United States Constitution, and article I, sections 7, 15, and 17 of the California Constitution.

Jury deliberations began in the afternoon of November 30, and resumed in the morning on December 1. During the afternoon session on December 1, the court informed counsel that the jury had sent the following note: "We want to know what happens if we cannot reach a unanimous decision? Judge makes decision? re-trial/entirely? re-trial/penalty?" The trial court asked counsel their views concerning the appropriate response to the jury's inquiry. Defense counsel stated he had not experienced this issue before, that his concern was that the questions were irrelevant to the jury's decision, and that he did not know what position to take. The court read a passage from *People v. Hines* (1997) 15 Cal.4th 997, 1075, which stated that "an instruction explaining the consequences of a hung jury 'would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process.' [Citations.]" The court concluded, "That suggests to me that these questions should not be answered. Defense counsel responded, "That's my feeling. And I hadn't read any cases on the issue." The court returned the written questions with the following response: "The Court cannot answer these questions." The jury deliberated until 3:00 p.m. on December 1, resumed deliberations the morning of December 2, and informed the court at 11:45 a.m. that it had reached a verdict.

Defendant contends the trial court erred by failing to inform the jury of the consequences of a deadlock. Defendant has waived this claim by agreeing with the trial court concerning the appropriate response to the jury's question. (*People v. Hughes* (2002) 27 Cal.4th 287, 402 (*Hughes*) ["this claim is waived by defense counsel's agreement with the trial court that informing the jury of the consequences of a deadlock would have been improper"].) Defendant asserts, however, that his counsel's earlier statement that he did not know what position to

74

take, and his subsequent statement that he had not read any cases addressing the issue, reflect that counsel did not make a knowing, intelligent, and voluntary decision to waive defendant's right. The authority he cites in support of this proposition is inapposite, because it involves a defendant's waiver of the right to counsel. (See *Godinez v. Moran* (1993) 509 U.S. 389, 400; *Johnson v. Zerbst* (1938) 304 U.S. 458, 465.) In the circumstances presented here, defendant must establish ineffective assistance of counsel to avoid the consequences of his counsel's actions.

In any event, the claim also fails on the merits. We repeatedly have held that a trial court is not required to educate a jury concerning the consequences of a deadlock. (See *Hughes, supra*, 27 Cal.4th at p. 402; see also *Jones v. United States* (1999) 527 U.S. 373, 383 [the court declined to exercise its supervisory powers to require in every capital case an instruction concerning the consequences of a deadlock at the penalty phase].) As we explained in *Hughes*, "Especially in a case like this — in which it was not clear that there *actually was* any deadlock — an instruction informing the jury of the consequence of a deadlock 'would have diminished the jurors' sense of duty to deliberate, and to be open to the ideas of fellow jurors. *The effect of a hung jury is irrelevant to the jury's deliberation of any issue before it.*' [Citation.]" (*Hughes, supra,* at p. 402, italics in original.)

Defendant notes, however, that the questions asked by juries in prior cases did not articulate retrial of the guilt phase as a possible consequence of a deadlock, and he contends that jurors' belief that such a retrial would occur would have resulted in improper pressure to reach a consensus regarding the penalty. This speculative contention does not alter our conclusion. The jury's note did not establish that any juror believed a retrial of the guilt phase would follow a deadlock at the penalty phase. Rather, the note reflected that one or more jurors apparently had speculated concerning possible scenarios, including the possibility

75

of a retrial.  Presumably, in most cases in which jurors request information about the consequences of a deadlock, jurors have given some thought to what events might follow a deadlock.  That jurors in the present case *articulated* various scenarios does not establish that any juror believed a particular result would follow a deadlock.  Nor did the jurors' speculation attenuate the principle that "informing the jury of the consequence of a deadlock 'would have diminished the jurors' sense of duty to deliberate, and to be open to the ideas of fellow jurors." (*Hughes, supra*, 27 Cal.4th at p. 402.)

Defendants' reliance upon *Simmons v. South Carolina, supra*, 512 U.S. 154, and *Morris v. Woodford* (9th Cir. 2001) 273 F.3d 826 is misplaced.  In *Simmons*, the prosecution urged the jury to consider defendant's future dangerousness, and the court refused to inform the jury that defendant was not eligible for parole.  In *Morris*, the written jury instructions erroneously stated that if the jury could not decide between death and life without the possibility of parole, it should return a verdict of life *with* the possibility of parole.  Thereafter, the court declined to answer the jury's question concerning what sentence would be imposed if the jury could not agree.  Thus, the jurors' alleged confusion in *Simmons* and *Morris* involved facts or principles that were relevant to the jurors' determination of the appropriate penalty.  In contrast, the issue of whether retrial of any aspect of the litigation will occur if the jury cannot reach a verdict is irrelevant to the jury's determination of the appropriate penalty.

> ### 10.  *Effect of our reversal of the kidnapping conviction and vacation of the kidnapping special circumstance finding upon the penalty*

Defendant contends that in the event any of the special circumstances found by the jury is vacated, upholding the judgment of death will deprive him of his right to due process, trial by jury, and to be free from the imposition of cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments to

76

the United States Constitution, and article I, sections 7, 16, and 17 of the California Constitution.

We have concluded that the kidnapping conviction must be reversed and the kidnapping special circumstance finding must be vacated, due to instructional error. Three other valid special circumstance findings remain: burglary, robbery, and sodomy. In addition, the facts the jury found in connection with the kidnapping conviction — defendant compelled the victim, through force or fear, to move to the procedure room, and the movement was "substantial" within the meaning of CALJIC No. 9.50 — could properly be considered by the jury as circumstances of the burglary, robbery, and sodomy, and of the murder under section 190.3, factor (a). Because the jury was authorized to give aggravating weight to these circumstances, regardless of whether the circumstances constituted kidnapping at the time defendant committed the crimes, our reversal of the kidnapping conviction and our vacation of the kidnapping special circumstance finding do not require reversal of the penalty. (See *Brown v. Sanders* (2006) 546 U.S. 212, 220 [invalidation of a special circumstance finding will not render the penalty unconstitutional if "one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances"]; *People v. Lewis* (2008) 43 Cal.4th 415, 520.) As in *People v. Mungia* (2008) 44 Cal.4th 1101, in which we reversed a torture-murder special circumstance finding, "[t]here is no likelihood that the jury's consideration of the mere existence of the [kidnapping] special circumstance tipped the balance toward death." (*Id.* at p. 1139.) Similarly, there is no likelihood that the mere existence of the kidnapping *conviction* tipped the balance toward death. Finally, as we explained in *People v. Lewis*, *supra*, at pages 520-522, our finding that the error in the kidnapping jury instruction was harmless with respect to the penalty does not violate the right to a jury determination of any fact that increases the penalty.

### 11. Cumulative prejudice

Defendant asserts that the errors committed at the guilt phase and the penalty phase, considered together, deprived him of a fair penalty phase hearing. We have found no error at the penalty phase, and, as noted above, there was no cumulative prejudicial effect at the guilt phase. Therefore, defendant suffered no cumulative prejudice from the actual and presumed errors, and was not deprived of a fair penalty phase hearing.

### 12. General challenges to California's death penalty scheme

As defendant acknowledges, we have rejected his general challenges to California's death penalty scheme.

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court. [Citations.]" (*Dykes, supra*, 46 Cal.4th at p. 813; see also *People v. Brady* (2010) 50 Cal.4th 547, 590.)

"We further 'reject the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death.' [Citations.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 766 (*Lynch*).) "The use of adjectives such as 'extreme' in section 190.3, factors (d) and (g), or 'substantial' in section 190.3, factor (g), do not serve as an improper barrier to the consideration of mitigating evidence. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 690 (*Jennings*).)

"[T]he death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing or deprive defendant of the right to a jury trial, because it does not require written findings, unanimity as to the truth of aggravating circumstances, or findings beyond a reasonable doubt that an aggravating circumstance (other than § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence. [Citations.] The jury may properly consider a defendant's

unadjudicated criminal activity.  [Citation.]  Nor, contrary to defendant's alternative claims, is a preponderance of the evidence standard of proof compelled for the findings that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate sentence, nor is the trial court required to instruct the jury that there is no burden of proof.  [Citations.]" (*Lynch, supra*, 50 Cal.4th at p. 766.)  Because no burden of proof or persuasion is required during the penalty phase, and the jury was instructed that, "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole," "no 'tie-breaking rule' was necessary."  (*People v. Bennett* (2009) 45 Cal.4th 577, 632.)  The decisions in *Blakely, supra*, 542 U.S. 296, *Ring, supra*, 536 U.S. 584, and *Apprendi, supra*, 530 U.S. 466, do not require otherwise.  (*D'Arcy, supra*, 48 Cal.4th at p. 308 [the court need not instruct that the jury must unanimously find true an aggravating factor; *Blakely*, *Ring*, and *Apprendi* do not alter this conclusion]; *People v. Mills* (2010) 48 Cal.4th 158, 214 [California's death penalty law is not invalid for failing to require unanimous findings of aggravating factors, nor for permitting consideration of unadjudicated criminal activity; *Blakely*, *Ring*, and *Apprendi* do not preclude consideration of unadjudicated criminal activity].)

" 'The failure to require intercase proportionality does not guarantee "arbitrary, discriminatory, or disproportionate impositions of the death penalty," or violate the Fifth, Sixth, Eighth, and Fourteenth Amendments.' [Citation.] Moreover, 'capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law.' [Citation.]" (*Lynch, supra*, 50

Cal.4th at p. 767; *Jennings, supra*, 50 Cal.4th 616, 690 [capital defendants and noncapital defendants are not similarly situated].)

"We again reject the argument that California's death penalty scheme is contrary to international norms of humanity and decency, and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution. [Citation.] 'International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.' [Citation.] Because we conclude that defendant's sentence was rendered in accordance with those requirements, we need not consider whether alleged violations of such requirements also would violate international law. [Citations.] We also reject the argument that the use of capital punishment 'as regular punishment' violates international norms of humanity and decency and hence violates the Eighth Amendment of the United States Constitution. 'California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance allegation is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to "regular punishment" for felonies. [Citations.]' [Citation.]" (*Jennings, supra*, 50 Cal.4th at pp. 690-691.)

### III.  CONCLUSION

We reverse the judgment of conviction for kidnapping, vacate the findings related to kidnapping, and otherwise affirm the judgment.

CANTIL-SAKAUYE, C.J.

WE CONCUR:

BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
CHANEY, J.*

_____
\*       Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

81

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**

A jury convicted defendant Gabriel Castaneda of first degree murder for killing a female employee who was working alone at a small medical clinic that had not yet opened for the day. The jury also made special circumstance findings that the killing occurred during the commission of sodomy, kidnapping, burglary, and robbery, and it returned a verdict of death.

Based on instructional error, the majority reverses the kidnapping conviction and vacates the kidnapping special-circumstance finding. Nevertheless, the majority points out, the judgment can be affirmed in its entirety because three special circumstance findings remain and because the facts underlying the kidnapping special circumstance were otherwise admissible at the penalty phase. (Maj. opn., *ante*, at p. 77.) I agree.

Unlike the majority, however, I conclude that the trial court erred in failing to instruct the jury on theft as a lesser offense necessarily included in the offense of robbery. I further conclude that the error did not prejudice defendant. Accordingly, I concur fully in the judgment.

**I**

When the victim's body was found in the clinic, which defendant had visited previously while the victim was working there, missing were her watch, ring, purse, and wallet. The taking of those items led to the robbery charge and the special circumstance allegation that the murder was committed during a robbery.

1

The evidence raised a question whether defendant formed his intent to steal *before* he completed his acts of force and intimidation — which included binding the victim, sodomizing her, and killing her by stabbing her with a screwdriver — or *after* he completed those acts. In the latter situation, defendant could be guilty only of theft, a lesser offense necessarily included within the crime of robbery. (*People v. DePriest* (2007) 42 Cal.4th 1, 50 (*DePriest*).) Defendant did not request an instruction on the lesser offense of theft, and the trial court gave no such instruction. The court should have done so.

The majority correctly explains the legal principles that apply here: " ' "Theft is a lesser included offense of robbery, which includes the additional element of force or fear." [Citation.] If intent to steal arose only after the victim was assaulted, the robbery element of stealing by force or fear is absent. [Citations.]' (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055-1056; see [*People v.*] *Yeoman* [(2003)] 31 Cal.4th [93,] 128-129 [to constitute robbery, intent to steal must be formed before or during the application of force].) 'Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.]' (*DePriest*, *supra*, 42 Cal.4th at p. 50.) 'Instructions on after-acquired intent and theft as a lesser included offense of robbery are unwarranted absent "substantial evidence" that the defendant first formed the intent to take the victim's property after applying force. [Citation.]' (*People v. Zamudio* (2008) 43 Cal.4th 327, 360.)" (Maj. opn., *ante*, at p. 44.)

I disagree, however, with the majority's conclusion that here "there is no substantial evidence that defendant formed the intent to steal only after he ceased applying force to the victim," and therefore that "the trial court was not required to give an instruction concerning grand theft." (Maj. opn., *ante*, at p. 46.)

Substantial evidence of after-formed intent to steal need not be testimony of the defendant (as it was in *People v. Turner* (1990) 50 Cal.3d 668, 690), or similar

2

direct evidence. As shown by our decision in *People v. Ledesma* (2006) 39 Cal.4th 641, 715, the substantial evidence needed to warrant a jury instruction on theft can be evidence of some motive for attacking the victim that is unrelated to robbery, thus supporting an inference that the intent to steal arose *after* the attack was completed.

Here, the evidence shows that sodomy — a preferred sexual practice of defendant's — was a motive for defendant's use of force on the victim. (Maj. opn., *ante*, at pp. 11, 32–33.) This evidence supports the inference that stealing the victim's ring, watch, wallet, and other property was an afterthought that arose when the assault on the victim was complete. Adding strength to this inference is evidence suggesting defendant's lack of interest in the property taken. He never used the victim's credit cards, and as for her ring and watch, he showed them to his cousin, said he was going to throw them away, and then, at the cousin's request, gave them to her instead. (*Id.* at pp. 35, 44–45.)

In concluding that defendant formed an intent to steal before (or during) his use of force on the victim, the majority points to physical evidence, such as the victim's book lying on the floor in the office where the victim kept her purse, suggesting that she and defendant struggled there, and the visibility of the victim's ring and watch while defendant was sodomizing her. (Maj. opn., *ante*, at p. 35.) That defendant and the victim struggled in the office where the victim kept her purse proves nothing regarding defendant's motive, and it is speculative to infer that because the victim's ring and watch were visible to defendant as he sodomized her, it was *during* the assault that he formed the intent to steal. The majority also infers defendant's preexisting intent to steal from his presumed need for money due to his drug addiction. (*Ibid.*) Again, the majority's reasoning is mere speculation. As I noted earlier, defendant did not use the victim's credit cards, and he gave away the victim's ring and watch.

3

The weak evidence of a preexisting intent to steal distinguishes this case from *People v. Gray* (2005) 37 Cal.4th 168, on which the majority relies.  (See maj. opn., *ante*, at p. 45.)  *Gray* involved a sexual assault, robbery, and murder in the victim's mobile home.  (*Gray*, *supra*, at pp. 180–181.)  Two days earlier, the defendant in *Gray* had burglarized five other mobile homes solely for the purpose of stealing.  (*Id.* at pp. 178–179.)  That prior history strongly implied that when the defendant broke into the victim's home he likewise had an intent to steal.  In contrast, here the evidence of a preexisting intent to steal is quite weak.

In summary, evidence that defendant here had a motive for the assault other than stealing, combined with evidence that defendant lacked interest in the property taken, constitutes "substantial evidence" that his intent to steal arose *after* the assault, thus requiring the trial court, on its own initiative, to instruct the jury regarding theft as a lesser offense necessarily included within the crime of robbery.  (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 360.)  In not doing so, the trial court erred.  I now turn to the question of prejudice.

## II

A trial court's failure to instruct the jury on a lesser offense that is necessarily included in the greater offense charged is harmless if " 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' "  (*People v. Turner*, *supra*, 50 Cal.3d at p. 690.)  Here, the trial court gave the jury a standard instruction on the special circumstance of murder during the commission of robbery, with language requiring the jury to find that the murder was committed "in order to carry out or advance" the robbery.  The jury found that special circumstance allegation to be true, thereby necessarily concluding that defendant acted with an independent intent to rob the victim.  Hence, the jury resolved adversely to defendant the factual question posed by the omitted instruction on theft as a lesser included offense of

4

robbery, and the trial court's error in omitting the latter instruction was harmless. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 621.)

Accordingly, I concur in the majority's affirmance of the judgment.


KENNARD, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Castaneda

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S085348
**Date Filed:** June 30, 2011

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** Mary E. Fuller

_____

**Counsel:**

John L. Staley, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly Wilkens and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John L. Staley
11770 Bernardo Plaza Court, Suite 305
San Diego, CA  92108
(858) 613-1047

Marvin E. Mizell
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-3040